RONNIE E. THORNTON, APPELLANT, V.
BARBARA J. THORNTON, APPELLEE.
704 N.W.2d 243

Filed September 13, 2005.   No. A-03-1419.

Alice S. Horneber, of Horneber Law Firm, for appellant.

Bradford Kollars for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Ronnie E. Thornton appeals from orders of the district court for Dakota County, Nebraska, finding him in contempt and awarding Barbara J. Thornton a judgment against him for attorney fees. For the reasons set forth herein, we vacate the orders of the district court and remand the cause for further proceedings.

## STATEMENT OF FACTS

On August 26, 2000, the court entered a decree dissolving the parties' marriage. In the decree, the trial court divided the marital estate, specifically finding:

> [I]n this case, [Ronnie] testified that because of his disability he is no longer an active participant in Thornton Plumbing & Heating Partnership or Thornton Plumbing & Heating, Inc. and it can be assumed that his interest is now

passive. [Ronnie] has also testified that his interest in these businesses has a negative value. Since [Ronnie] has a one-half interest in both it would not be unfair to award that interest to the non-family member nor would it interfere with the management of that business. The only evidence of the value of the partnership and corporation before the court is that given by [Ronnie] of ($1,200.00) subject to a debt of $9,908.00 which the court accepts for a total value of ($11,108.00).

Therefore, the trial court awarded, among other things, the following items to Barbara:

All of [Ronnie's] interest, real or personal, in and to Thornton Plumbing & Heating, a partnership EI number 42-1310671 including, but not limited to, [Ronnie's] interest in and to The East 75 feet of Lot 12 in Block 40, of Sioux City, in the county of Woodbury and State of Iowa as well as any interest in any other real estate held by [Ronnie] in Dakota County constituting an asset in this partnership and all shares (assumed to be 500 common shares) or other interests held by [Ronnie] in and to Thornton Plumbing & Heating, Incorporated EI number 42-1483118 subject to debt of $9,908.00.

The decree also stated that "within 30 days [Ronnie] and [Barbara] shall execute and deliver to the other party any deed or other documents that may be reasonably required to accomplish the intent of this Decree of Dissolution of Marriage." Further, the decree provided:

In the event either party shall fail to comply with the provisions of this Decree of Dissolution of Marriage with respect to the Court's decision concerning the division of marital assets within thirty (30) days of the day the Decree is entered, then this Decree shall constitute an actual grant, assignment and conveyance of the title to the property and rights in such manner and with such force and effect as shall be necessary to effectuate the terms of the Decree.

On December 29, 2000, Barbara filed a "Verified Motion for Contempt Citation." In Barbara's motion, she claimed that Ronnie had failed to transfer to Barbara his stock in Thornton Plumbing & Heating, Inc., as ordered in the decree. Barbara also alleged that

her "attempts to seek necessary information concerning Thornton Plumbing, Inc. and Thornton Plumbing & Heating Partnership have been prevented by [Ronnie], in conjunction with" Ronnie's attorney, Alice Horneber, and "by the business entities themselves, through their attorney . . . Horneber, such that the intent of the Court's Decree and its full force and effect is frustrated." Barbara further contended that the "[a]ctions of [Ronnie] constitute knowing and willful violations of the Decree of this Court, which has not been modified, reversed, or set aside, and remains in full force and effect," and that "[t]his action in conjunction with the business entities has prevented [Barbara] from having and exercising her rights as one-half owner of these business entities and depreciate the value of that interest as equitably awarded by this Court." Thus, Barbara asked that Ronnie be held in contempt until he complied with the decree.

On December 29, 2000, the trial court entered an order requiring Ronnie to appear on January 23, 2001, and show cause why he should not be charged with contempt. On February 15, Barbara's attorney appeared before the trial court and informed the court that the Woodbury County, Iowa, sheriff had been unable to serve Ronnie with the summons. On April 16, Barbara filed a "Verified Motion for Substitute Service" alleging that the Woodbury County sheriff's office had been unable to serve Ronnie with a summons on two different occasions. Barbara requested

> leave of Court to allow service to be made by leaving the process at [Ronnie's] usual place of residence and mailing a copy by First Class Mail to [Ronnie's] last known address, and in addition by leaving the process at [Ronnie's] usual place of employment, and mailing a copy by First Class Mail to [Ronnie's] usual place of employment, which shall constitute a manner reasonably calculated under the circumstances [to] provide [Ronnie] with actual notice of the proceeding and an opportunity to be heard.

Barbara's motion for substitute service was sustained by the trial court on April 25, 2001. In its order, the trial court found that "reasonable diligence by any other method provided by statute to obtain service on [Ronnie] has been unsuccessful." The court then

permit[ed] service to be made by the Woodbury County, Iowa, Sheriff's office by leaving the Summons and Show Cause Order with a person of suitable age or securely affixing the same at a prominent point on said property at both [Ronnie's] usual place of residence and usual place of employment and by [Barbara's] mailing a copy of the Summons and Show Cause Order by First Class Mail to [Ronnie's] last known address of his residence and his place of employment.

The court ordered that after substitute service was complete, "it shall be determined that under the circumstances [Ronnie] has been provided actual notice of the proceedings and an opportunity to be heard."

The record indicates that the Woodbury County sheriff's office successfully posted the summons and show cause order at both Ronnie's last known address and usual place of employment. On May 17, 2001, Barbara filed a "Certificate of Service" indicating that on May 3, the required documents were mailed to Ronnie's last known address, his usual place of employment, and to his attorney's office; however, they were sent via certified mail rather than first-class mail. The record does not include any signed receipts and does include a returned letter sent to Ronnie; therefore, the record contains no evidence that Ronnie ever signed for or received any of the certified letters. On June 8, the trial court made a journal entry finding that "there has been personal service upon [Ronnie] concerning [Barbara's] Application for an Order and Citation for Contempt, and that [Ronnie] is granted 14 days in which to enter his appearance in this matter." Ronnie was ordered to appear before the court on June 13, and the court stated that "his failure to do so shall result in [the trial court's] issuing an Order that an Arrest Warrant for [Ronnie] shall issue."

On May 16, 2002, the trial court made a journal entry regarding Barbara's December 29, 2000, motion for contempt citation. In the journal entry, the trial court found as follows:

One aspect of these motions was that the Court examine a letter dated March 5, 2002, from Attorney Alice Horneber. Attorney Horneber states, "until such time as [Ronnie] is served with documents in a quasi-criminal proceeding, and retains the services of this office to represent him and

prepare for court proceedings, I am not in a position to appear on his behalf". Notice from the Court and subsequent letter from the undersigned made it clear that the subject matter of the March 11, 2002, hearing was the afore cited motion for contempt. There was never any indication to [Ronnie] or his attorney that he might be 'served with documents in a quasi-criminal proceeding'. The attorney for [Ronnie] apparently continued to represent him in the underlying dissolution. The motion for contempt was a result of [Ronnie's] failure to comply with the Order of Dissolution. The Court finds no basis for [Ronnie] to refer to a possible quasi-criminal proceeding nor his attorney to question her retention for such a proceeding. If Attorney Horneber is no longer retained in this dissolution proceeding the motion to withdraw should have been filed long ago. In this regard, this same motion for contempt was set for hearing in October of 2001. At that time, the attorney for [Ronnie] stated she would not be present for the hearing. There was no mention of a quasi-criminal proceeding only a statement that attorney Horneber would be in Court elsewhere, the foregoing was imparted to the Court via a copy of a letter sent to [Barbara's] attorney . . . . The Court was not informed that Attorney Horneber had withdrawn and quite obviously had failed to move for a continuance. The Court further notes that the motion for contempt was set for hearing in May of 2001 and [Barbara] and her attorney appeared but [Ronnie] and his attorney failed to appear. Finally, the Court finds that [Ronnie] has had more than ample opportunity and time to respond to the verified motion for contempt and has failed to do so. The Court finds that [Ronnie] is in Contempt of the Order and Judgment of the Court entered on August 26, 2000.

The Court ORDERS that [Ronnie] comply with the Order and Judgment by June 3, 2002, and provide the Court with evidence of compliance by said date. Should [Ronnie] fail to comply, he should appear for sentencing on June 10, 2002, at 1:00 p.m. [Ronnie] is admonished that should he desire representation that he insures that he obtains counsel in light of some of the foregoing.

Relative to the question of sanctions against Attorney Horneber, the Court continues to take that under advisement.

Ronnie did not comply with the court's order by June 3, 2002, nor did he appear for sentencing on June 10. On November 5, Barbara filed an affidavit alleging that Ronnie had not complied with the parties' dissolution decree and had not appeared on June 10. In the affidavit, Barbara gave Ronnie's last known address and alleged that "[e]xtradition of [Ronnie] may be necessary." Finally, Barbara claimed that "[t]he Court should issue an order for the arrest of [Ronnie], wherever he may be found, for contempt of Court and failure to appear before the Court as ordered." On November 19, the trial court entered an "Order and Bench Warrant for Contempt and Failure to Appear." In the order, the trial court found that Ronnie had willfully violated existing orders of the court, that he continued to be in contempt of the court's orders, and that he had failed to appear before the court as ordered.

On August 19, 2003, Ronnie filed a "Verified Motion for Contempt Citation" alleging that Barbara had "intentionally, willfully, and without just cause prevented [Ronnie] from having any meaningful contact" with the parties' minor son, Seth. The motion contended that Barbara had "intentionally, willfully, and without just cause refused to release" items awarded to Ronnie in the parties' divorce decree and that Barbara had "destroyed the items and/or caused them to be destroyed such that they are now without value." On August 21, a citation to show cause was issued to Barbara ordering her to "show cause, if any [she] may have, why [she] should not be accused, and placed upon trial and punished for contempt of Court."

On September 8, 2003, Ronnie filed a special appearance "objecting to the jurisdiction of the Court over the person of [Ronnie]." He alleged that after Barbara filed her motion for contempt citation, he was never personally served with any of the documents filed by her. Ronnie claimed that Barbara "seeks to have the Court punish [Ronnie] by fine and by imprisonment. Such actions are deemed criminal in nature and governed by the same rules. . . . Such action requires actual personal service upon [Ronnie]." Ronnie asserted that Barbara "obviously recognizes [the] requirement [of personal service] in that [Barbara]

has attempted personal service upon [Ronnie], albeit in an improper method" and that Barbara "did attempt service simply by mailing some documents to [Ronnie's] counsel; however, those mailings . . . were sporadic and were not all inclusive." Ronnie further alleged that Barbara "has not met the requirements of service for the type of action she attempts to prosecute against [Ronnie]."

Ronnie filed a "Motion to Set Aside Journal Entry Filed May 16, 2002 and Order and Bench Warrant of November 19, 2002," on September 9, 2003. In this motion, Ronnie claimed the following:

1. [Barbara] has filed numerous documents in the above-referenced matter. She also caused various orders and journal entries to be entered. Some of those documents were sent to [Horneber], others were not.

2. A review of the Court file indicates that there were numerous communications between the Court and counsel for [Barbara] about which neither [Ronnie] nor [Horneber] were made aware. This is reflected by the fact that the Court file indicates orders being entered when no notices of hearing were set and hearings being set but never taking place.

3. On May 7, 2002, counsel for [Barbara] confirmed telephone calls between himself and the Court, subsequent to which counsel for [Barbara] appears to have prepared a proposed Journal Entry. It further appears that there was a telephone conversation between counsel for [Barbara] and the Court on May 9, 2002, concerning a draft the Court provided solely and only to counsel for [Barbara] on May 8, 2002.

4. A letter was directed by [Horneber] to the Court via mail and fax on May 15, 2002. It states: "I am unable to specifically address what [Barbara's counsel] told the Court so as to having orders entered subsequent to the Decree. [Barbara's attorney] obviously felt it appropriate to have ex parte communications with the Court while asserting, at the same time, that I am an attorney of record." . . .

5. Without hearing or addressing the above-referenced letter, a Journal Entry was filed on May 16, 2002.

6. The Journal Entry filed on May 16, 2002, and the decision announced and/or to be entered in conjunction with the proceedings held on June 10, 2002, were appealed.

7. The Nebraska Supreme Court dismissed the appeal stating, "Order appealed from is not a final, appealable order."

8. Thereafter, [Barbara] filed an Affidavit on November 5, 2002. Neither [Ronnie] nor [Horneber] were served with that Affidavit. Thus, without the knowledge of [Ronnie] or [Horneber], the Court entered an Order and Bench Warrant for Contempt and Failure to Appear on November 19, 2002.

9. Subsequent to the filing of her Verified Motion on December 29, 2000, [Barbara] has prosecuted her matter in such a way as to cause confusion and improper orders being entered with regard to [Ronnie]. [Barbara] appears to take the position that service is accomplished simply by serving [Horneber]; however, on numerous occasions, [Barbara] has failed to serve documents upon [Horneber], had ex parte communications with the Court, and had orders setting hearings entered without anything pending before the Court and without [Horneber's] knowledge.

10. [Barbara's] failure to follow a simple, direct and appropriate route has resulted in confusion and prejudice to [Ronnie]. The Journal Entry entered on May 16, 2002 (which is not a final order) and the Order and Bench Warrant for Contempt and Failure to Appear entered November 19, 2002, should be set aside in their entirety.

Also on September 9, 2003, a hearing was held on the parties' pending motions for contempt citations. The trial court first took up the matter of whether Ronnie had complied with the dissolution decree. Ronnie testified in his own behalf. He testified that he had not transferred stock in the Thornton plumbing corporation to Barbara "[b]ecause the business by-laws by the State of Iowa say they can't be transferred, the way I understand it." Ronnie testified that he had been informed by certified public accountants that the effect of the divorce decree was that he "forfeited" Thornton Plumbing & Heating to his brother, Lonnie Thornton, who was the sole stockholder "according to the Iowa

by-laws." Ronnie said that he "didn't have any interest [in the Thornton plumbing corporation], it was taken from me."

When asked if Ronnie had done everything that he could to comply with the court's decree, Ronnie replied, "[a]s far as my knowledge to what goes on with legal matters in corporations and business, I've done everything I can [to] comply, my hands are tied as far as giving what I can give, [and not giving] what [I] can't give, according to the Iowa law." Ronnie testified that he believed the court's decree had the effect of eliminating any interest he had in the Thornton plumbing businesses. He stated, "I knew that the business would be handed over to Lonnie automatically according to the law because the stocks could not be transferred and if — and if they were, then all the stock would automatically go to Lonnie, that was in the by-laws." .

On cross-examination, Ronnie admitted that he had not transferred his interest in the Thornton plumbing partnership because "there was so much money owed with the bank against the partnership that that wasn't allowable, either." Ronnie testified that the sources of legal advice he and Lonnie had received came from certified public accountants and Horneber. Ronnie testified that he had not received any benefits from the ownership of the corporation or the partnership because "[t]here was — there's so much money owed against that business that there couldn't possibly be a dime taken out of it to give to anybody."

On redirect examination, Ronnie testified that loans had been made to the plumbing businesses and that the lending institutions had taken as security "all of the properties, all the equipment, everything that they could attach." Ronnie said that he was not "at will to transfer anything without satisfying the lending institutions." Ronnie also testified that "not only were the businesses required to pay these debts, but [Ronnie and Lonnie] personally [were] required to pay them too."

Following arguments from the parties, the trial court noted as follows:

[I]t's clear that [Ronnie] has failed to comply with the decree [entered] on August 2[6], 2002 — or excuse me, 2000. He has failed to show to the court adequately why he has failed to comply with that decree, and therefore, [Ronnie], I'm inclined to remand you to custody until such

time as you do comply or show why you have not complied. You haven't done so today. I have a feeling you're not going to. You're gonna drag this out for as long as you can. And it's not gonna happen anymore. You can drag it out for as long as you can, but you're gonna be sitting in jail while you drag it out.

. . . .

. . . The court finds that you are in contempt. That finding has already been made by Judge Robinson, that you are in contempt. The court today finds that you have failed to show cause why you should not be sentenced . . . and therefore you are to be held in custody until such time as you have shown to the court adequately that you have complied with the decree of August 2[6], 2000. I will give you further opportunity to show cause why you should be released from custody, but understand, it's going to be up to you to show why you should be released from custody. You understand that. And so after we complete the other hearing this morning, you are remanded to custody.

Next, the parties were heard on Ronnie's August 19, 2003, motion for contempt against Barbara, which motion claimed that she failed to turn over property decreed to Ronnie, destroyed some of that property, and interfered with his visitation with the parties' minor child. Barbara testified in her own behalf. She testified that she had never "intentionally, willfully, or without just cause prevented [Ronnie] from seeing his [minor] son . . . Seth." Barbara said that she had not come in between Ronnie and Seth and that she had tried to encourage visitation. She testified that visitation has occurred and that Seth and Ronnie "seem to have a good time." Barbara also testified that Ronnie had attempted only one time to retrieve the property awarded to him in the decree. The items were at the marital residence, and Ronnie came to the residence and was threatening to take things not awarded to him in the decree. Barbara said that she called the police and that the police handled the situation from there. Barbara said that since that date, Ronnie had never attempted to retrieve any of the property. Barbara testified that she had no problem with Ronnie retrieving the property, "as long as he does it in a proper and peaceful fashion."

Barbara testified that she was unfamiliar with $200 in cash that Ronnie, in his motion for contempt, had claimed he was owed. She also testified that she had not "intentionally, willfully, and without just cause refused to timely pay the outstanding mortgage" on the marital residence. She said: "The bills were late, simply because I didn't have the money to pay them. I paid them as soon as I possibly could. I don't believe they were ever past a month late. That was the roof over my children's head. I paid it first above all." She also testified that she was unaware of any effect the late payments had had on Ronnie's credit. She also asked the court to award attorney fees to her because she believed that "this whole matter concerning the contempt citation filed, not only by [Ronnie], but the one that [Barbara] had to file, is of a frivolous nature."

On cross-examination, Barbara said that she had not removed from the marital residence any of the items awarded to Ronnie in the decree and that she was unaware of any additional attempts by Ronnie to get the property. Regarding visitation, Barbara said that "Ron[nie] had threatened Seth, and told him if he didn't come for visitation he would take him or send Boys and Girls Home after him." She said that "Seth was 15 . . . and he has his own choices." Barbara said that she encouraged Seth to visit Ronnie but that she "did not force him. He was 15 years old." Barbara conceded that Ronnie wanted to exercise visitation with Seth. She also conceded that Ronnie had not received all of the property awarded to him in the decree.

Ronnie again testified in his own behalf. He said that he and Barbara had "been awarded joint custody of Seth." Ronnie said that he had tried to call Seth on numerous occasions, but that no one answered the telephone. He went to Barbara's residence on one occasion to visit, but when Barbara came home, she made him leave. He said that he believed his relationship with Seth was being blocked by Barbara and her attorney. Ronnie said that Barbara had Seth read the parties' divorce decree. He also testified that "Barb[ara] made the comment that when I divorced her, I divorced them kids and she told the kids that." Ronnie said that in 2001, he was allowed to see Seth "[n]ot at all, hardly," and that in 2002, he was allowed to see Seth "[a] couple times, I guess, three times, maybe." Regarding the property Ronnie

was awarded and did not receive, he said that Barbara had moved some items to a different location. He said that he had made efforts, personally and through Horneber, to get the items from Barbara but that he had not gotten them. He also testified that he was very concerned with the condition of the items. Finally, he testified that his name is still on the mortgage for the marital residence, that he has received late payment notices, and that his credit has been damaged.

On cross-examination, Ronnie conceded that he and Barbara did not have joint custody of Seth and that while Ronnie wanted visitation with Seth, Ronnie did not file anything with the trial court when the visitation did not occur. At the conclusion of the testimony, the trial court found that "the citation with regard to visitation should be and is hereby dismissed." The trial judge specifically noted:

I'm hard pressed to find that at after three years [Ronnie] is complaining about the visitation and when you're talking about a 15 to an 18 year old boy, although reasonable rights of visitation are generally defined under Wilson v. Wilson, [224 Neb. 589, 399 N.W.2d 802 (1987),] that doesn't necessarily mean that in each case those are what reasonable visitation is. You have to take into account the — the children themselves. And — and if there were, in fact, problems with visitation, [Ronnie] could have been in here much sooner than three years after the events of which he complains.

The trial court also ordered Barbara to make available to Ronnie any property awarded to him in the decree that he had not yet received. The judge noted that "[w]ith regard to the [$200] cash, I'm not going to address that at this time." The court found that Barbara had not "intentionally, willfully, or without cause refused to make timely payments on the mortgage payments and that part of the citation is dismissed." The court took the matter of attorney fees under advisement and remanded Ronnie to custody. Horneber asked the court "for some specifics because in the documentation other than it states shares of stock, one doesn't know what else is expected or anticipated." The trial court notified Ronnie that he "need[s] to

transfer whatever interest is provided by — in the decree to [Barbara]. I'm not going to address that further."

Also on September 9, 2003, Ronnie filed a "Notice of Compliance" claiming the following:

3. In compliance with the Court's Decree, [Ronnie] has drafted, executed, and delivered the following:

A. Stock certificate for Thornton Plumbing & Heating, Inc. reflecting 500 shares in the name of Ronnie E. Thornton dated January 29, 1999, and sold, assigned, and transferred unto Barbara J. Thornton . . . by date of September 9, 2003.

B. Assignment of Ronnie E. Thornton, General Partner, in Thornton Plumbing & Heating, partnership EI Number 42-1310671, an Iowa partnership, assigned to Barbara J. Thornton dated September 9, 2003;

C. Quit Claim Deed from Ronnie E. Thornton to Barbara J. Thornton for the East 75 feet of Lot 12 in Block 40 of Sioux City, County of Woodbury and State of Iowa dated September 9, 2003;

D. Quit Claim Deed from Ronnie E. Thornton to Barbara J. Thornton for Lot 17 Island Homes Addition, Third Filing, Dakota County, Nebraska, dated September 9, 2003.

4. With the above, [Ronnie] has transferred all of his interest, real or personal, in and to Thornton Plumbing & Heating, an Iowa general partnership and to Thornton Plumbing & Heating, Inc., all to Barbara J. Thornton.

A further hearing was held on September 12, 2003, regarding the notice of compliance. Horneber said that Ronnie "has prepared, signed, and given to the court all documentation . . . that can effectuate a complete and total transfer of his interest" in the businesses. A quitclaim deed was entered into evidence indicating that on January 14, 2003, Ronnie had deeded to Lonnie the same real estate awarded to Barbara in the dissolution decree. A warranty deed was also entered into evidence showing that also on January 14, Lonnie conveyed the same real estate to a third party. Ronnie admitted that he had purported to convey this same real estate to Barbara on September 9 and that on that date, "he had no titled interest in the real estate," while he did have a titled interest in the real estate on the date of the decree.

When asked why Ronnie made the January 14, 2003, transfer, Horneber replied:

> Because we had a huge number of debts with the Dakota County Bank and he was a personal guarantor on those debts. [Barbara] did not come in and sign off at the Dakota County Bank to be a personal guarantor on those debts. At the end of 2000, Judge, this business was not making its payments and the bank was coming to [Ronnie] and telling him that this business is not making his payments, it's payments we want you, as the personal guarantor, to take care of these debts. So, the end effect is that the bank insisted that these debts get paid. The way the debts got paid, Your Honor, was that the bank insisted that somebody take care of the debts. Ron[nie] didn't have any ability to take care of these debts, Your Honor, so, Lon[nie] went and took over the obligation and made sure that the debts were paid with Dakota County Bank, and that's . . . in conjunction with the warranty deed then from Lon[nie] to the [third party], and that's how all of the debts got paid at the — or how some of the debts, or the debts got paid at the Dakota County Bank, because Dakota County Bank had a complete real estate mortgage and a complete security interest in all of this property with regard to the business, Your Honor.

The trial court found that Ronnie "has tried to pull the wool over the eyes of [Barbara] by . . . conveying something that he knew full well he didn't have the authority to convey. . . . [I]f it was to defraud the court or to defraud [Barbara], I don't know." The court further stated that "[b]y giving [Barbara] a sham deed, that's certainly not complying with — with the decree. . . . Conveying the real estate to his brother in order to get out of conveying it to [Barbara] is not a reason why he can't comply." Horneber then noted that she and Ronnie "know of nothing to do with regard to the assignment of the partnership interest with regard to the stock, there's nothing else that can be done." The trial court then found that Ronnie had "failed to comply with the decree," and the court "remanded [him] to custody until such time as [he has] shown full compliance." Again, Horneber asked the court for direction on how to comply. The judge replied that

Ronnie "better find out a way to get that real estate back from the [third party] and convey it to whom it belongs. . . . [H]e needs to comply with the decree. That's all I'm saying."

On September 16, 2003, the trial court entered an order overruling Ronnie's special appearance and overruling Ronnie's motions to set aside the May 16, 2002, journal entry and the November 19, 2002, order and bench warrant. The court further dismissed Ronnie's contempt motion against Barbara, but it did order that Barbara make available to Ronnie certain items of personal property in her possession. The court also found that "the question of cash in the amount of $200.00 is reserved to be ruled on at a later date."

Also on September 16, 2003, the trial court filed another order finding that Ronnie had "failed to show that he has complied with the Decree entered in this matter on August 26, 2000." Further, since Ronnie was previously found to be in contempt of the judgment of the court entered on August 26, 2000, the court found that Ronnie "should be and is hereby sentenced to incarceration in the Dakota County Jail until such time as he is able to show to the Court that he has complied with said Decree."

On November 19, 2003, a hearing was held on Barbara's request for attorney fees. At the hearing, the parties stipulated that a rate of $100 per hour was a fair and reasonable hourly rate. The court took judicial notice of pertinent exhibits, and Barbara entered an additional affidavit regarding attorney fees she had incurred. At the conclusion of the hearing, the trial court took the matter under advisement. On November 20, the court entered its award. The court stated:

> Reviewing the Court's involvement in this matter, it is clear that since the entry of the decree in this matter [Ronnie] has acted in bad faith, requiring [Barbara] to file the necessary pleadings in an attempt to enforce the decree that was entered in this matter some three years ago. Even to this date, [Ronnie] has failed to comply with the requirements of the decree.

Accordingly, the trial court found that Barbara "should be and is hereby allowed an attorney fee in the amount of $2,927.70 and [that] judgment is awarded to [Barbara] and against [Ronnie] in that amount." Ronnie has appealed to this court.

## ASSIGNMENTS OF ERROR

Ronnie alleges, restated, that the trial court erred in (1) finding that there had been effective service upon him, (2) finding him in contempt of the parties' decree of dissolution, (3) overruling his special appearance and his motion to set aside the May 16, 2002, journal entry and the November 19, 2002, order and bench warrant, (4) holding a hearing solely on whether he had complied with the decree, (5) failing to find Barbara in contempt of the parties' dissolution decree, (6) sentencing him to incarceration until he complied with the decree, (7) failing to award him $200 in cash that he was awarded in the decree, and (8) awarding Barbara attorney fees in the amount of $2,927.70.

## STANDARD OF REVIEW

An appellate court, reviewing a final judgment or order in a contempt proceeding, reviews for errors appearing on the record. *City of Beatrice v. Meints*, 12 Neb. App. 276, 671 N.W.2d 243 (2003). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* A trial court's factual finding in a contempt proceeding will be upheld on appeal unless the finding is clearly erroneous. *Id.*

## ANALYSIS

*Personal Service.*

Ronnie first alleges that the trial court erred when it found that there had been "personal service" upon him. It is true that on June 8, 2001, the trial court made a journal entry finding that "there has been personal service upon [Ronnie] concerning [Barbara's] Application for an Order and Citation for Contempt." The record does not support a finding of "personal service," because it is clear that Ronnie was never personally served. However, the trial court had earlier granted Barbara's motion for substitute service, and we believe that the court's journal entry was intended to convey that substitute service had been effectively completed. Therefore, we must address whether the substitute service upon Ronnie was effective.

In its order granting Barbara's motion for substitute service, the court

permit[ed] service to be made by the Woodbury County, Iowa, Sheriff's office by leaving the Summons and Show Cause Order with a person of suitable age or securely affixing the same at a prominent point on said property at both [Ronnie's] usual place of residence and usual place of employment and by [Barbara] mailing a copy of the Summons and Show Cause Order by First Class Mail to [Ronnie's] last known address of his residence and his place of employment.

However, although the record does show that the Woodbury County sheriff's office did affix the summons and show cause order as ordered by the trial court, Barbara did not strictly comply with the order. The documents she was ordered to send to Ronnie were sent via certified mail, rather than by first-class mail as ordered by the trial court.

■ The acceptable methods of substitute service in Nebraska are found in Neb. Rev. Stat. § 25-517.02 (Reissue 1995), which provides:

Upon motion and showing by affidavit that service cannot be made with reasonable diligence by any other method provided by statute, the court may permit service to be made (1) by leaving the process at the defendant's usual place of residence and mailing a copy by first-class mail to the defendant's last-known address, (2) by publication, or (3) by any manner reasonably calculated under the circumstances to provide the party with actual notice of the proceedings and an opportunity to be heard.

■ Therefore, both the statute and the court's order required Barbara to mail a copy of the process by first-class mail rather than by certified mail. Statutes prescribing the manner of service of summons are mandatory and must be strictly complied with. *Anderson v. Autocrat Corp.*, 194 Neb. 278, 231 N.W.2d 560 (1975). A statute which authorizes the use of postal service to notify a defendant that he has been sued in court is strictly construed and must be specifically observed. *Id.* Further, the record establishes that the certified letters sent to Ronnie were not accepted by Ronnie, and there is no showing that these certified letters were ever received by him. As a result, we find that there was no effective substitute service upon Ronnie and that the district

court erred when it found that Ronnie had been effectively served. Because there was no effective service upon Ronnie at the time he was found in contempt and because he had not yet voluntarily submitted to the court's jurisdiction, the trial court lacked jurisdiction over Ronnie at that time. The trial court erred when it overruled Ronnie's special appearance on the basis that service had already been perfected upon him. Further, the court's May 16, 2002, journal entry finding Ronnie in contempt of the August 26, 2000, decree, its November 19, 2002, order and bench warrant, and its November 20, 2003, award of attorney fees to Barbara are all vacated.

*Ronnie's Motion for Contempt Citation.*

Ronnie next alleges that the trial court erred when it failed to grant his motion for contempt against Barbara. Ronnie filed a "Verified Motion for Contempt Citation" against Barbara on August 19, 2003. When Ronnie filed the motion, he voluntarily submitted to the court's jurisdiction over him. See *Galaxy Telecom v. SRS, Inc., ante* p. 178, 689 N.W.2d 866 (2004) (one who invokes power of court on issue other than court's jurisdiction over one's person makes general appearance so as to confer on court personal jurisdiction over that person). In the motion, Ronnie asked the court to find Barbara in contempt for "intentionally, willfully, and without just cause" preventing Ronnie from (1) having any meaningful contact with Seth, (2) refusing to release certain property and $200 cash awarded to Ronnie in the decree, (3) destroying those items or causing them to be destroyed such that they are now without value, and (4) refusing to timely pay the outstanding mortgage on the marital residence, resulting in the mortgage holder continuously contacting Ronnie for payment and threatening foreclosure proceedings.

Although the trial court, in its September 16, 2003, order, found that "[t]he claims contained in [Ronnie's] Verified Motion for Contempt are without merit and said Motion is dismissed," the court also held that "the question of cash in the amount of $200.00 is reserved to be ruled on at a later date." Therefore, regarding Ronnie's motion, the trial court failed to dispose of all the issues raised. As such, the trial court's ruling on Ronnie's motion is not final. For an appellate court to acquire jurisdiction

of an appeal, there must be a final order entered by the court from which the appeal is taken; conversely, an appellate court is without jurisdiction to entertain appeals from nonfinal orders. *Mumin v. Dees*, 266 Neb. 201, 663 N.W.2d 125 (2003). Therefore, we lack jurisdiction to decide this issue.

*Additional Assignments of Error.*

We need not address Ronnie's additional assignments of error, because they have been either addressed earlier or deemed moot by our earlier holdings.

## CONCLUSION

We find that the trial court did not have jurisdiction over Ronnie when it found him in contempt; it did not have jurisdiction over him until he voluntarily submitted to the court's jurisdiction by filing his motion for contempt. We vacate the trial court's May 16, 2002, journal entry finding Ronnie in contempt, its November 19, 2002, order and bench warrant, the portion of its September 16, 2003, order sentencing Ronnie for contempt, and its November 20, 2003, award of $2,927.70 in attorney fees to Barbara. The matter is remanded to the trial court for further proceedings consistent with this opinion.

ORDERS VACATED, AND CAUSE REMANDED
FOR FURTHER PROCEEDINGS.