975 So.2d 940 (2007)
Ex parte D.B. and T.B.
(In re D.B. and T.B.
v.
M.A.)
Ex parte M.A.
(In re D.B. and T.B.
v.
M.A).
1060077 and 1060529.
Supreme Court of Alabama.
June 15, 2007.
*942 B. Andrew Whitmire, Jr., Birmingham; and Edwin K. Livingston, Montgomery, for D.B. and T.B.
Carey W. Spencer, Jr., Birmingham; and Linda L. Cole, Birmingham, for M.A.
Troy King, atty. gen., Sharon E. Ficquette, chief legal counsel, and James E. Long, deputy atty. gen., Department of Human Resources, brief of intervenor, Department of Human Resources, in support of M.A.
SMITH, Justice.
These two petitions for the writ of certiorari, which have been consolidated for purposes of issuing one opinion, involve an interstate dispute over custody of a minor child ("the child"); the parties claiming custody of the child are the child's biological father, M.A. ("the father"), a resident of Nebraska, and D.B. and T.B. ("the adoptive couple"), Alabama residents who sought to adopt the child in Alabama. The Court of Civil Appeals held that the State of Nebraska had subject-matter jurisdiction to decide the child's custody. D.B. v. M.A., 975 So.2d 927, 937 (Ala.Civ.App. 2006). However, the Court of Civil Appeals held that the Nebraska judgment awarding custody of the child to the father was not enforceable in Alabama against the adoptive couple because that judgment did not comply with notice provisions of the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A ("the PKPA"), or with Alabama's version of the Uniform Child Custody Jurisdiction and Enforcement Act, § 30-3B-101 et seq., Ala.Code 1975 ("the UCCJEA"). D.B., 975 So.2d at 930. We affirm.

Factual Background and Procedural History
The opinion of the Court of Civil Appeals provides the following factual background and procedural history of this case:
"On January 21, 2004, the child was born in Nebraska. Several days later, on January 25, 2004, the child was placed by his mother, M.T. ('the mother'), who is a resident of Nebraska, into the physical custody of the adoptive couple. Five days later, on January 30, 2004, the father learned of the potential adoption. That same day, he filed notice of his intent to claim paternity and to obtain custody with the Nebraska Department of Health and Human Services. On February 2, 2004, the adoptive couple moved the child to Alabama. On February 12, 2004, the adoptive couple filed a petition for the adoption of the child in the probate court of Montgomery County ('the probate court'). Several days later, the probate court issued an interlocutory order awarding custody of the child to the adoptive couple.
"On February 20, 2004, the father filed a petition in a Nebraska trial court seeking an adjudication of his claim of paternity and his right to custody of the child. On March 17, 2004, the father and the mother appeared at a pretrial hearing in the Nebraska trial court. Also present at the hearing was an attorney representing the adoptive couple, although he did not make an official appearance. During the hearing, the mother admitted that M.A. is the father of the child in this case. Following the hearing, the Nebraska trial court entered an order finding that it had jurisdiction over the parties and the subject matter of the case. That order further *943 noted that the father and the mother had stipulated that the father was the natural father of the child. On March 30, 2004, the father moved the Alabama probate court to stay the adoption proceedings.
"On April 7, 2004, the Nebraska trial court reaffirmed that it had jurisdiction to determine the child's custody. On April 21, the Nebraska trial court held a trial, during which that court received testimony from the father, his mother, and the guardian ad litem appointed to protect the interests of the child. The mother was not present at the trial.
"During the trial, the father testified that, at one point, he and the mother had planned on getting married but that the mother had broken off their relationship. The father also testified that he had tried to maintain contact with the mother and wanted to participate in the upbringing of their child but that, because of a lack of cooperation from the mother, he had been unable to do so.
"The evidence introduced at trial also indicated that the mother had evidently decided, without the consent of the father, to put their child up for adoption. Before the child was born, the mother arranged to have the child adopted by the adoptive couple. The mother's attorney apparently sent a notice of this potential adoption to the father; however, that notice was mailed to the wrong address. The mother placed an announcement about the potential adoption in a local newspaper in Nebraska; that announcement stated that the father had until five days after the last publication of the announcement, i.e., until February 12, 2004, to file notice of his intent to claim paternity and to obtain custody. As noted above, the father filed notice of his intent to claim paternity and to obtain custody of the child on January 30, 2004. On the same day as the trial, the Nebraska trial court entered a judgment stating, in part:
"`3. All the evidence indicates [that the father] did everything he needed to do to be both the biological and actual father of the minor child, wanting to raise, take care of, and support his minor child;
"`4. The evidence shows [that the father] did not abandon or neglect the minor child or [the mother] either during the pregnancy or after the minor child's birth;
"`5. All the evidence indicates [that the father] did all he needed to do to claim the paternity and custody of his minor child, and complied with all applicable Nebraska statutes;
"`6. [The father] did not consent to the adoption of the minor child, and he did not relinquish his parental rights to his minor child;
"`7. All the evidence indicates [that the father] is a good and decent person, and that [the father] is a fit and proper person to have the care, custody and control of his minor child;
"`8. The evidence further shows [that the father] has supportive parents committed to helping [the father] raise his minor child; and
"`9. This Court is legally required [to place the minor child], and it would be in the best interests of the minor child to be placed[,] in the care, custody and control of [the father].
"`The Court further ORDERS, ADJUDGES and DECREES that:
"`1. [The father's] Petition for Adjudication and Right to Custody should be, and is hereby, sustained;
"`2. [The father] is adjudicated to be the natural and biological father of the minor child born on January 21, 2004; and

*944 "`3. It would be in the best interests of the minor child if his physical and legal care, custody and control were awarded to [the father], and that [the father] should have the physical custody of said minor child and all rights that pertain thereto.
"`IT IS SO ORDERED.'
"The Nebraska trial court supplemented that judgment six days later, adding in part:
"`4. With respect to the adoption proceedings in the State of Alabama, to continue such proceedings would not be in the minor child's best interests; and
"`5. Any adoption proceedings in Alabama be dismissed and any Orders thereto be dissolved and the State of Alabama assist in returning the custody of the minor child . . . to his biological and custodial parent, . . . [the father], so that the [father] can obtain custody of . . . [the child].'
"On April 29, the father moved to enforce the Nebraska trial court's judgment in the probate court. The next day, the father also filed a verified objection to the adoption petition in the probate court. On May 10, 2004, the adoptive couple moved to transfer the adoption proceeding to the juvenile court of Montgomery County ('the juvenile court'), and the probate court did so. On June 4, 2004 the adoptive couple filed in the juvenile court [case no. JU-04-593] a response to the father's motion to dismiss the adoption action. In that response, the adoptive couple asserted, among other things, that the Nebraska judgment was invalid because they had not been served in the Nebraska proceeding.
"On May 24, 2004, the father filed in the family court of Montgomery County (`the family court') a request for registration and enforcement of the Nebraska judgment declaring him to be the father of the child [case no. DR-04-648].
"On June 14, 2004, the juvenile court action and the family court action were consolidated in the juvenile court. The father's attorney sought to serve notice of the request for registration of the Nebraska judgment on the mother by certified mail, then by publication. No response was ever received from the mother. The attorney for the adoptive couple was mailed notice of the request for registration of the Nebraska judgment, and he later admitted at a hearing on a Rule 60(b), Ala. R. Civ. P., postjudgment motion that he, as well as the adoptive couple, was aware of the registration proceeding.
"The juvenile court judge who ultimately presided over this case held a hearing on whether an Alabama court could properly exercise jurisdiction over this matter, and on September 22, 2005, the juvenile court entered a judgment wherein it stated, in part:
"`3. That the State of Alabama hereby declines jurisdiction of the case, finding that the State of Nebraska has never relinquished jurisdiction and that jurisdiction is proper in the State of Nebraska, County Court of Madison, Nebraska.
"`4. That the Juvenile Court Clerk shall immediately transfer this matter to the State of Nebraska, Madison County Court for further proceedings in this matter. The Court notes that the issues of termination of parental rights and adoption, if any, may be properly heard by the Nebraska Court.
"`5. That a copy of this Order be transmitted to the Honorable Reese McKinney, Montgomery County, Alabama Judge of Probate for his determination *945 as to whether the pending adoption case should be stayed, held in abeyance or dismissed without prejudice.'
"On September 30, 2005, the adoptive couple filed a Rule 59, Ala. R. Civ. P., postjudgment motion; on October 3, they filed a notice of appeal (appeal no. 2050034). Citing the adoptive couple's appeal pending before this court, the juvenile court denied the Rule 59 postjudgment motion on the basis that it was `moot.' The adoptive couple subsequently filed a Rule 60(b), Ala. R. Civ. P., postjudgment motion. . . .
"On December 8, 2005, while the adoptive couple's Rule 60(b) motion was pending in the juvenile court, the Alabama Department of Human Resources ('DHR'), on behalf of the State, moved to intervene, specifically noting that the State has an interest in the enforcement of the UCCJEA. DHR sought to intervene for the purpose of requesting that the juvenile court enforce the Nebraska judgment and order law-enforcement officials to take the child into custody and then turn him over to the custody of the father. On December 13, 2005, the juvenile court granted DHR's motion to intervene.[[1]]
"The juvenile court conducted a hearing on the adoptive couple's Rule 60(b) motion, and it ultimately denied that motion on December 20, 2005. The juvenile court's judgment on the Rule 60(b) motion provided, in part:
"`. . . .
"`A review of the documents filed in both the [family] court and the [juvenile] court, now consolidated, clearly shows that prior to Judge Anderson's registration of the Nebraska custody Order, the Nebraska Interstate Compact on Placement of Children (I.C.P.C.) administrator had requested the return of the child from the Alabama I.C.P.C. administrator. Attached hereto is a copy of that request dated May 17, 2004, which reads,
"`" . . . According to the interstate compact on the placement of children . . . article V (copy attached), [Nebraska] is requesting that the [Alabama] I.C.P.C. instruct the local attorney or supervising agency to cooperate in returning the child to [Nebraska]. The father has claimed paternity and been awarded custody. [Nebraska] court orders attached. Please notify Mary Dyer today, May 17, 2004, of the plan to return the child. The father will be in Atlanta, Georgia, on Wednesday, May 19th. Arrangements can be made for the child's return to him in Atlanta by contacting his attorney, Melissa Wentling at [address omitted]."
"`In addition, attached is the affidavit of Mary Dyer filed with this Court [on] June 25, 2004 in support of the natural father's Motion to Dismiss and for Enforcement filed by counsel for the father [that] clearly sets out the timeline and evidences at paragraph # 3 that the adoptive couple were required to sign an executed "At-Risk Placement" document which provided that in the event the birth father came forward or asserted his interest in the child, even after the time of placement, that the State of Alabama could require these adoptive parents to return *946 the child to the State of Nebraska for further determination of the rights of the putative father. Mrs. Dyer's affidavit at paragraph #6 states that the Nebraska I.C.P.C.'s position is that the natural father had complied with all applicable Nebraska law pertaining to claiming paternity and seeking custody of . . . [the child].'
"(Emphasis added.)
"The juvenile court ultimately concluded that Nebraska is the proper jurisdiction to determine the matter of the child's custody; however, despite stating that the Nebraska judgment was properly registered in Alabama, the juvenile court did not specifically order the return of the child to the father. On December 28, 2005, the adoptive couple appealed the denial of their Rule 60(b) motion (appeal no. 2050277)."
D.B., 975 So.2d at 935 (capitalization in original; footnotes omitted).
The adoptive couple and the father each filed a petition for a writ of certiorari. In case no. 1060077, this Court granted the adoptive couple's petition to determine whether the Court of Civil Appeals erred in holding: (1) that Alabama may not assert jurisdiction in accordance with the home-state jurisdiction provision found in the PKPA, 28 U.S.C. § 1738A(c)(2)(A), or with any other jurisdictional provision stated in § 1738A(c)(2)(B)-(D); and (2) that Alabama must defer to the Nebraska custody proceedings in this custody dispute, even though the Court of Civil Appeals held that the Nebraska judgment is not enforceable against the adoptive couple. In case no. 1060529, this Court granted the father's petition to determine whether the Court of Civil Appeals erred in refusing to enforce the judgment of the Nebraska court placing custody of the child with the father.

Discussion

I.
The first question we must consider is which state  Nebraska or Alabama  has subject-matter jurisdiction to decide this child-custody dispute. The adoptive couple argues that the Court of Civil Appeals erred in affirming the juvenile court's decision that Nebraska is the appropriate state to make a custody determination as to the child. The adoptive couple maintains that Alabama was the first state to issue a custody determination as to the child under the PKPA and that "[a] correct application of the PKPA to the undisputed facts of this case clearly establishes that Alabama has continuing preferred jurisdiction under 28 U.S.C. § 1738A(c)(1) and (2)(B)." (Adoptive couple's brief in case no. 1060077, p. 14.)
As noted, the adoptive couple initiated the adoption proceeding in Alabama on February 12, 2004, in the Montgomery County Probate Court, and on February 17, 2004, that court issued an interlocutory order awarding "custody" of the child to the adoptive couple. Under the PKPA, a "custody determination" is "a judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications." 28 U.S.C. § 1738A(b)(3). Therefore, the adoptive couple argues that the interlocutory order of the Montgomery County Probate Court meets the definition of a "custody determination" in the PKPA.
Even if the interlocutory order of the probate court is a "custody determination" under the PKPA, however, it still must be "consistent with the provisions of [the PKPA]." Among other things, that means the assertion of jurisdiction by the probate court must meet one of the five "conditions" in § 1738A(c)(2)(A)-(E). Section 1738A(c)(2) provides:

*947 "(c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if:
". . . .
"(2) one of the following conditions is met:
"(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;
"(B) (i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;
"(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse;
"(D) (i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody or visitation of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or
"(E) the court has continuing jurisdiction pursuant to subsection (d) of this section."
(Emphasis added.)
In the brief submitted to this Court, the adoptive couple addresses two of those conditions: § 1738A(c)(2)(A) and § 1738(c)(2)(B). The adoptive couple argues that the PKPA recognizes the order of the probate court as a proper exercise of jurisdiction because, the adoptive couple contends, "there is no `home state' as defined by 28 U.S.C. § 1738A(b)(4). . . . [and] Alabama satisfies the `best interest-significant connection' test of 28 U.S.C. § 1738A(c)(2)(B)." Moreover, the adoptive couple argues that "[b]ecause there is no `home state,' no other state would have jurisdiction under 28 U.S.C. § 1738A(c)(2)(A)."
However, in contending that the child has no "home state" under the PKPA, the adoptive couple presents an argument they did not offer to the Court of Civil Appeals. In that court, the adoptive couple argued that Alabama was the "home state" as defined by § 1738A(b)(4), and, of the five conditions listed in § 1738A(c)(2)(A)-(E), the adoptive couple cited only § 1738A(c)(2)(A), the condition addressing home-state jurisdiction.
The Court of Civil Appeals rejected the adoptive couple's argument that Alabama has home-state jurisdiction under the PKPA. The Court of Civil Appeals stated:
"The adoptive couple argue in their brief to this court that Alabama is the child's home state and that the probate court's interlocutory order of February 17, 2004, is a child-custody determination *948 under the PKPA. The adoptive couple claim that the juvenile court's `refusal' to recognize Alabama as the child's home state, and to give effect to the probate court's interlocutory order, was error because it led to the court's conclusion that Alabama did not have jurisdiction.
"However, it appears that under the PKPA Alabama is not the child's home state and, furthermore, that Alabama would not have jurisdiction to determine the child's custody under the PKPA. The PKPA defines `home state' as:
"`(4) "[H]ome State" means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period.'
"28 U.S.C. § 1738A(b)(4) In arguing that Alabama is the home state of the child, the adoptive couple also rely upon 28 U.S.C. § 1738A(c), which provides, in part:
"`(c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if 
"`(1) such court has jurisdiction under the law of such State; and
"`(2) one of the following conditions is met:
"`(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State.'
"(Emphasis added.) In this case, the child was born in Nebraska; the child was moved to Alabama when he was only 11 days old, and he clearly did not live with the adoptive couple from birth. Therefore, Alabama cannot claim home-state jurisdiction under the PKPA."
D.B., 975 So.2d at 936. Although the adoptive couple had not argued that Alabama's assertion of jurisdiction met one of the other conditions stated in § 1738A(c)(2)(B)-(E), the Court of Civil Appeals additionally stated that "under the facts of this case, an Alabama court cannot invoke jurisdiction under any of the other provisions of 28 U.S.C. § 1738A." D.B., 975 So.2d at 937.
The Court of Civil Appeals having rejected the argument that Alabama has home-state jurisdiction under the PKPA, the adoptive couple now argues to this Court that there is no home state under the PKPA but that the probate court's assertion of jurisdiction is consistent with the best interest-significant connection test of § 1738A(c)(2)(B). Thus, the adoptive couple argues that the judgment of the Court of Civil Appeals should be reversed based on a position that, in addition to not being argued to that court, is the opposite of what the adoptive couple argued to that court.
This Court has stated that it "`cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the [lower] court.'" Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82, 97 (Ala.2003) (quoting Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992)). Even so, however, we do not agree with the adoptive couple's assertion *949 that there is no home state under § 1738A(c)(2)(A).
As noted, the biological father filed an action in Nebraska on February 20, 2004, seeking custody of the child. Because the father's action was filed eight days after the adoptive couple had filed their petition for adoption in the Montgomery County Probate Court and three days after the Montgomery County Probate Court had issued an interlocutory order giving the adoptive couple custody of the child, the adoptive couple contends that the PKPA recognizes Alabama as having exclusive jurisdiction for determining the child's custody and that § 1738A(g) prohibited Nebraska from exercising jurisdiction over the father's later filed action. Section 1738A(g) provides:
"A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination."
Although the Nebraska action was filed after the Montgomery County Probate Court issued the interlocutory order, § 1738(g) prohibited Nebraska from exercising jurisdiction in the father's later filed custody action only if the Montgomery County Probate Court "[was] exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination." (Emphasis added.)
To be "consistent with the provisions of" the PKPA, the Montgomery County Probate Court's exercise of jurisdiction must meet one of the five conditions stated in § 1738A(c)(2)(A)-(E). As noted, the adoptive couple offers to this Court the condition stated in § 1738A(c)(2)(B)  that is, jurisdiction based on "significant connections" or the "best interest of the child." However, the PKPA prefers home-state jurisdiction under § 1738A(c)(2)(A); therefore § 1738A(c)(2)(B)(i) places a restriction on a state's ability to exercise significant-connection jurisdiction. For a state to exercise jurisdiction under § 1738A(c)(2)(B), it must "appear[] that no other State would have jurisdiction under subparagraph (A)." Thus, if a state asserts home-state jurisdiction under § 1738A(c)(2)(A), then another state cannot assert significant-connection jurisdiction under § 1738A(c)(2)(B). See Martinez v. Reed, 623 F.Supp. 1050, 1056 (E.D.La.1985) ("Although the June 1984 proceeding in Alabama was filed first, before the natural mother filed her suit in Louisiana on October 19, 1984, the Alabama court's child custody determination was not made consistently with the provisions of the federal act and, thus, the [adoptive couple's] priority in filing their action does not outrank the natural mother's suit in Louisiana. . . . [T]he natural mother's suit was filed within six months of the child's birth in Louisiana. Thus, Louisiana's `home status' cannot be destroyed by the [adoptive couple's] removal of the child [to Alabama] for custody purposes."); Atkins v. Atkins, 308 Ark. 1, 4-7, 823 S.W.2d 816, 818-19 (1992) (affirming an Arkansas trial court's refusal to give full faith and credit to a custody determination from a Louisiana court; even though the Louisiana custody action had been filed before the custody action was filed in Arkansas, the court noted that, as the home state, Arkansas had exclusive jurisdiction under the PKPA; therefore Louisiana could not assert significant-connection jurisdiction); Garrett v. Garrett, 292 Ark. 584, 587-89, 732 S.W.2d 127, 128-30 (1987) (applying the same principle); State v. District Court of the Fifth District, 831 P.2d 233, 240 (Wyo.1992) ("A *950 foreign state which is neither a decree state nor a home state may not assume jurisdiction in contravention to the [Wyoming Uniform Child Custody Jurisdiction Act] and PKPA preference for `home state' jurisdiction."). See also Roger M. Baron, Federal Preemption in the Resolution of Child Custody Jurisdiction Disputes, 45 Ark. L.Rev. 885, 893-94 (1993) ("The PKPA also utilizes the `significant connection' and `substantial evidence' criteria as a basis for jurisdiction, but only if there is no home state. When a child's home state can be established, the PKPA grants exclusive jurisdiction to that state." (footnotes omitted; emphasis added)); Andrea S. Charlow, Jurisdictional Gerrymandering and the Parental Kidnapping Prevention Act, 25 Fam. L.Q. 299, 308 (1991) ("The PKPA . . . does not allow resort to the `significant connection' test unless there is no home state.").
A state may exercise home-state jurisdiction if the state is the child's home state at the time the custody action is filed. § 1738A(c)(2)(A)(i). In addition, however, a state may exercise home-state jurisdiction under § 1738A(c)(2)(A)(ii), which provides:
"A child custody . . . determination made by a court of a State is consistent with the provisions of this section only if . . . such State . . . (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State. . . . "
(Emphasis added.)
Thus, under § 1738A(c)(2)(A)(ii), a state that has home-state status remains the home state for up to six months after the child leaves that state if the following two conditions exist: (1) the reason for the child's absence from the state is that a "contestant" has removed the child from the state; and (2) "a contestant continues to live in" the state. Id. See also Martinez, 623 F.Supp. at 1056. In this case, Nebraska has home-state jurisdiction in accordance with § 1738A(c)(2)(A)(ii).
It is undisputed that the child was born in Nebraska and that the child lived there with the biological mother until the child was approximately 11 days old. Thus, for approximately the first 11 days of the child's life, Nebraska met the definition of "home state" provided in § 1738A(b)(4). Id. ("`home State' means . . . in the case of a child less than six months old, the State in which the child lived from birth with [his parents, a parent, or a person acting as parent]"). The reason for the child's absence from Nebraska is that the adoptive couple removed the child from that state. The adoptive couple meets the PKPA definition of "contestant," because they "claim a right to custody . . . of [the] child." § 1738A(b)(2). Finally, the father, who also is a "contestant" under the PKPA, continues to reside in Nebraska. Accordingly, under § 1738A(c)(2)(A)(ii) and § 1738A(b)(4) of the PKPA, Nebraska was the home state at the time the adoptive couple removed the child from Nebraska. Therefore, for six months after the adoptive couple removed the child from Nebraska, Nebraska remained the home state under the PKPA.
By filing a custody action in Nebraska on February 20, 2004, the father invoked Nebraska's home-state jurisdiction under the PKPA, because he commenced a proceeding within six months of the adoptive couple's removal of the child from Nebraska. Consequently, under the PKPA, any claim of significant-connection jurisdiction in the Montgomery County Probate Court is inferior to Nebraska's home-state jurisdiction; because the Nebraska action was *951 commenced within six months of the child's removal from Nebraska, it makes no difference that the Nebraska action was commenced after the Montgomery County Probate Court had issued an interlocutory order awarding custody to the adoptive couple. § 1738A(c)(2)(B); Martinez, 623 F.Supp. at 1056; Atkins, supra; Garrett, supra. See also Martinez, 623 F.Supp. at 1055 ("[T]he mere filing of an action is not an event giving Alabama absolute and interminable jurisdiction."). Accordingly, the Court of Civil Appeals did not err in affirming the judgment of the juvenile court holding that Nebraska has subjectmatter jurisdiction to adjudicate the child-custody dispute between the adoptive couple and the father.[2]

II.

A.
Because the PKPA recognizes Nebraska as having exclusive subject-matter jurisdiction to determine the issue of custody of the child, the next issue is whether the Nebraska custody determination of April 21, 2004, is enforceable against the adoptive couple. The parties agree that because the adoptive couple had physical custody of the child when the April 21, 2004, order was entered the adoptive couple was entitled to notice of the Nebraska proceedings. See 28 U.S.C. § 1738A(e); § 30-3B-303(a), Ala.Code 1975; § 30-3B-205, Ala.Code 1975; § 43-1242, Neb.Rev. Stat. The parties appear to agree that the adoptive couple had actual notice of the Nebraska proceedings, although the record does not indicate when they received that notice. D.B., 975 So.2d at 932 (indicating that an attorney for the adoptive couple was present at a hearing in the Nebraska proceeding but did not make an official appearance). Finally, the parties agree that no attempt was made to serve the adoptive couple with process in the Nebraska proceedings.
The parties disagree, however, on whether actual notice of the Nebraska proceedings was sufficient notice to the adoptive couple. The father contends that actual notice of the Nebraska proceedings was sufficient, but the adoptive couple argues *952 that they were entitled to service of process.
The Court of Civil Appeals addressed this issue as follows:
"We begin our analysis with Alabama's version of the UCCJEA, which states in part:
"`(a) A court of this state shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this chapter or the determination was made under factual circumstances meeting the jurisdictional standards of this chapter and the determination has not been modified in accordance with this chapter.'
"§ 30-3B-303, Ala.Code 1975 (emphasis added). Furthermore, the relevant portions of § 30-3B-205, Ala.Code 1975, provide:
"`(a) Before a child custody determination is made under this chapter, notice and an opportunity to be heard in accordance with the standards of Section 30-3B-108 must be given to all persons entitled to notice under the law of this state as in child custody proceedings between residents of this state, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child.'
"(Emphasis added.) The adoptive couple point out that Nebraska has also adopted the UCCJEA, and its corresponding statutes provide almost identical terms. For example, § 43-1242, Neb.Rev.Stat., provides:
"`(a) Before a child custody determination is made under the Uniform Child Custody Jurisdiction and Enforcement Act, notice and an opportunity to be heard in accordance with the standards of section 43-1233 shall be given to all persons entitled to notice under the law of this state as in child custody proceedings between residents of this state, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child.'
"(Emphasis added.) Furthermore, the PKPA requires:
"`(e) Before a child custody or visitation determination is made, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of a child.'
"28 U.S.C. § 1738A(e). In all these statutes, `physical custody' is defined to mean the `physical care and supervision of a child,' § 30-3B-102(14), Ala.Code 1975, and § 43-1227(14), Neb.Rev.Stat., or the `actual possession and control of a child.' 28 U.S.C. § 1738A(b)(7). Although it appears that the adoptive couple had actual notice of the Nebraska proceeding, given that one of their attorneys was present, nothing in the record indicates that the adoptive couple were properly served with notice of that proceeding. Additionally, the adoptive couple's attorney who was present in the Nebraska proceeding never made an official appearance, and there is no indication in the record that he participated in the proceeding in any way.
"This court has previously held that when another state enters a custody order without providing proper notice to a relevant party, or without giving that party a reasonable opportunity to be heard, such an order was not made in accordance with the PKPA. Ex parte Raywood, 549 So.2d 103, 104 (Ala.Civ. App.1989). When an order is not made *953 in accordance with the PKPA, it is `not entitled to full faith and credit by the courts of Alabama.' Id. Moreover, our supreme court has observed that `neither the Full Faith and Credit Clause of the United States Constitution, nor any legislation under its authority, entitles a child custody [judgment] entered by a court lacking in personam jurisdiction over affected parties, to extraterritorial effect.' Ex parte Dean, 447 So.2d 733, 737 (Ala.1984) (citing May v. Anderson, 345 U.S. [528,] 543 (1953), and Kulko v. Superior Court of California, 436 U.S. 84, 91 (1978)).
"In this case, the Nebraska judgment does not comply with the requirements of the PKPA. Additionally, Alabama's statutes provide that a foreign state's judgment shall be recognized and enforced only `if the [foreign state's] court exercised jurisdiction in substantial conformity with [Alabama's version of the UCCJEA] or the determination was made under factual circumstances meeting the jurisdictional standards of [Alabama's version of the UCCJEA].' § 30-3B-303. It is evident that the Nebraska judgment also does not comply with the requirements of Alabama's version of the UCCJEA. Finally, the Nebraska judgment appears to not comply with Nebraska's version of the UCCJEA in regard to providing notice to the adoptive couple.
"We note that to the extent the Nebraska judgment concerned the father's paternity of the child, no notice was specifically required to be given to the adoptive couple under the above-referenced Nebraska statutes. However, the Nebraska judgment purported to award custody of the child to the father, and thus the adoptive couple were entitled to proper notice and service of process. The lack of proper notice and service of process in this context means that a court does not obtain personal jurisdiction over a respondent. See generally, Nelson v. Robinson, 154 Neb. 64, 70, 46 N.W.2d 892, 895 (1951) (noting that Nebraska has mandatory explicit statutory provisions providing for service of process and when service did not meet those requirements the trial court did not obtain jurisdiction over the defendant).
"Therefore the Nebraska judgment was entered without personal jurisdiction over the adoptive couple, and although Nebraska has proper subjectmatter jurisdiction over this matter, the Nebraska judgment need not be enforced in this state."
D.B., 975 So.2d at 940.
We agree with the Court of Civil Appeals on this issue. The father has not shown that the notice requirements under either the UCCJEA or the PKPA were met before the Nebraska custody determination was made.
The father argues that actual notice is sufficient notice under Nebraska law. Specifically, he contends that § 43-1233, Neb.Rev.Stat., does not require that notice be given by service of process. Instead, he essentially argues that any means of giving notice is permissible so long as actual notice is achieved. We disagree.
Section 43-1233(a), Neb.Rev.Stat., provides:
"Notice required for the exercise of jurisdiction when a person is outside this state may be given in a manner prescribed by the law of this state for service of process or by the law of the state in which the service is made. Notice must be given in a manner reasonably calculated to give actual notice but may be by publication if other means are not effective."
*954 Emphasizing the word "may" in the phrase "may be given" in the first sentence of § 43-1233(a), the father argues that service of process is permissive, not mandatory. In the second sentence of § 43-1233(a), he places the following emphasis  "Notice must be given in a manner reasonably calculated to give actual notice " to argue that actual notice is sufficient notice under Nebraska law.
If the father's construction of § 43-1233(a) is correct, however, the first sentence of the statute is superfluous; that is, if the Nebraska legislature intended to allow any means of notice to suffice so long as actual notice is given, it would be meaningless to also authorize service of process in accordance with Nebraska law or with the law of the state in which the service is made. This Court has held: "`"A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."'" Ex parte Wilson, 854 So.2d 1106, 1110 (Ala. 2002) (quoting Ex parte Welch, 519 So.2d 517, 519 (Ala.1987), quoting in turn 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 46.06 (4th ed.1984)).
Construing the first sentence of § 43-1233(a) as authorizing notice only by "a manner prescribed by the law of [Nebraska] for service of process or by the law of the state in which the service is made" gives effect to both the first and the second sentences. Under that construction, the second sentence limits or qualifies what the first sentence authorizes. Thus, whatever means of service of process is used, whether under Nebraska law or the law of the state in which service is made, it must be "reasonably calculated to give actual notice." In addition, "if other means of service are not effective," then the second sentence authorizes service by publication.[3]
Even more important than whether the notice requirements of Nebraska were met, however, is whether the notice requirements of the PKPA were met.[4] To be enforceable in Alabama, the Nebraska custody determination ultimately would have to comply with § 1738A(e) of the PKPA, which provides: "Before a child custody or visitation determination is made, reasonable notice and opportunity to *955 be heard shall be given to . . . any person who has physical custody of a child."
The father asserts that "[i]t is clear from the plain language that actual notice is sufficient to satisfy the notice requirements of the PKPA." (Father's brief, p. 31.) To support that assertion, the father cites Martinez v. Reed, 490 So.2d 303 (La. Ct.App.1986); Ciotola v. Fiocca, 86 Ohio Misc.2d 24, 684 N.E.2d 763 (Ohio Com.Pl. 1997); and Crabbe v. Kissell, No. FA-01-0727774 (Conn.Super.Ct., Nov.16, 2001) (unpublished decision). As additional, persuasive authority, the father cites Brooke v. Willis, 907 F.Supp. 57, 60 (S.D.N.Y. 1995).
However, the cases cited by the father do not hold that actual notice  without any attempt at service of process  is sufficient to satisfy the requirement of the PKPA that "reasonable notice and opportunity to be heard" be given to the adoptive couple. Martinez, 490 So.2d at 306-07 (holding that notice requirements of the Uniform Child Custody Jurisdiction Act were satisfied when service was made on respondents by certified mail and respondents had actual notice of the proceedings); Ciotola, 86 Ohio Misc.2d at 35, 684 N.E.2d at 770-71 (rejecting claim of inadequate notice; respondent was served by mail and had actual notice of proceedings before she was served by mail); Crabbe (rejecting claim of inadequate notice; attempt was made to serve respondent at her last known address and she received actual notice); Brooke, 907 F.Supp. at 60 (rejecting claim of inadequate notice; "several attempts were made by Federal Marshals and by [the] Petitioner to personally serve Respondent and to mail her the relevant papers at her last two known New York addresses" but "were unsuccessful because of Respondent's evasive tactics"; in addition, the petitioner claimed to have informed the respondent of the proceedings). The father in this case does not assert that any attempt was made to serve the adoptive couple with notice of the Nebraska proceedings; therefore, the cases on which the father relies are distinguishable. Consequently, the father has not demonstrated that the Court of Civil Appeals erred in holding that under the PKPA the adoptive couple did not receive adequate notice of the Nebraska proceedings.

B.
Our holding in Part II.A recognizes that the Nebraska custody determination cannot be enforced against the adoptive couple because they were not adequately notified of the Nebraska proceedings. However, the adoptive couple also insists that the lack of adequate notice means the Nebraska child custody proceeding itself is void. We disagree.
As noted in Part I of this opinion, the PKPA recognizes Nebraska as having exclusive subject-matter jurisdiction for proceedings to be brought to determine the child's custody, because Nebraska is the home state under § 1738A(c)(2)(A)(ii). Therefore, § 1738A(c)(2)(B) and § 1738A(g) prohibit Alabama from exercising significant-connection jurisdiction concurrently with the State of Nebraska over the subject matter of the child's custody.
The prohibition in § 1738A(g) is a prohibition on concurrent proceedings. Accordingly, for § 1738A(g) to apply as a bar to concurrent proceedings, there does not have to exist a child-custody determination that satisfies the PKPA's notice requirement stated in § 1738A(e)  that is, the prohibition stated in § 1738A(g) could apply when there has been no child-custody determination in the first state. Section 1738A(g) provides:
"(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced *956 during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination."
(Emphasis added.)
In this case, proceedings to determine the child's custody have been initiated in Nebraska and in Alabama. Because Nebraska is the home state under the PKPA, it has preferred jurisdiction under the PKPA, even though an enforceable custody determination has not yet emerged from those proceedings. Consequently, Alabama cannot exercise significant-connection jurisdiction. See Wachter v. Wachter, 439 So.2d 1260, 1264-66 (La.Ct. App.1983) (holding that Louisiana could not exercise significant-connection jurisdiction because proceedings had been commenced in the home state of New Jersey; however, the custody determination by the New Jersey court could not be enforced because the notice requirement of § 1738A(e) had not been met).[5]

Conclusion
The judgment of the Court of Civil Appeals is affirmed.
AFFIRMED.
COBB, C.J., and SEE, LYONS, WOODALL, and PARKER, JJ., concur.
STUART, SMITH, and BOLIN, JJ., concur specially.
MURDOCK, J., recuses himself.
BOLIN, Justice (concurring specially).
"Adoption statutes are intended to benefit children in need of a home and parental care by providing for creation of a status substantially equivalent to that of parent and child.
". . . .
"In order to fulfill their duty to children within their respective borders, especially those in need of homes, and promote the general welfare of children, states have enacted statutes designed to regulate the creation of the closest conceivable counterpart of the relationship of parent and child, and to place a minor child adopted into a family on the same basis as a child born into the family, while, at the same time, protecting the rights of the children, and whenever possible, the rights of the natural and adoptive parents. The primary purpose of an adoption statute is to promote the welfare or best interests of the children, which include the encouragement of adoption in general and an expeditious and positive adoption specifically."
2 C.J.S. Adoption of Persons § 4 (2003) (footnotes omitted; emphasis added).
I concur in the main opinion. I write specially to lament that cases such as this one languish far too long in multijurisdictional adoption disputes and therefore completely fail to fulfill the above-stated purposes and principles of the adoption process. Anyone who has witnessed the end product of the nationally publicized cases of Baby Jessica[6] and Baby Richard,[7] two infant adoptions litigated for years *957 before it was determined that the custody of both infants should be given to the biological father, would be heartless and lacking human emotion if he or she did not recoil at the sight of these children being pulled away from the only loving adults they had ever known and restored to, essentially, a stranger. In regard to the stability every child needs and deserves, it has been stated:
"Every child has an interest in a safe and permanent home environment because stability is essential to a child's physical, mental and emotional development. As one commentator noted:
"`Children are not static objects. They grow and develop, and their proper growth and development require more than day-to-day satisfaction of their physical needs. Their growth and development also require day-to-day satisfaction of their emotional needs, and a primary emotional need is for permanence and stability. Only when their emotional needs are satisfied can children develop the emotional attachments that have independent constitutional significance. A child's need for permanence and stability, like his or her other needs, cannot be postponed. It must be provided early.'
"Furthermore, once the child and adoptive parents have developed a stable home environment, removal from that environment may be physically, emotionally and psychologically detrimental to the child's development. . . . "
Kimberly Barton, Who's Your Daddy?: State Adoption Statutes and the Unknown Biological Father, 32 Cap. U.L.Rev. 113, 143 (2003) (footnotes omitted).
The adoption of a child by loving adoptive parents is as beautiful a process as the birth of a child to biological parents. The adoption of a child creates a new family unit, which is just as sacred as that created when a child is born to biological parents. In either case, the bonding process between parent and child is an almost instantaneous process. As a former probate judge, I can state from experience that adoptive couples love and view their child no differently than biological parents do theirs. The family relationship created by an adoption is just as strong for the adoptee. Any newborn adoptee, just as in the case of the child here, has no choice or voice in the matter of where he or she lives, or with whom. Each day, the newborn adoptee grows with and loves, and is nurtured by and depends upon, the only mother and father the newborn has ever known. The infant adoptee knows not whether this mother or father cares for him by birthright or by court order. For society to allow litigation to continue for years while this relationship is being fostered before judicially deciding that this relationship is improper is unfathomable, unmerciful, and unconscionable.
I note that "[m]ost adoptions of children born out of wedlock are consensual rather than contested; they take place with the valid consents for the termination of parental rights of the biological parents." Janet Ann Briseno, Idaho's Putative Father Registry Statute: Is There Really an Opportunity Interest for Putative Fathers?, 33 Idaho L.Rev. 415, 416 (1997) (footnotes omitted). Protecting the rights of each party to an adoption inures to the benefit of all concerned and allows for what should be the stated goal in any adoption proceeding  a final judgment of adoption that puts to rest all issues and provides a stable, permanent, and continuing home life for the adoptee. Typically, the adoption of children born to unwed parents is initiated by the biological mother; her consent, therefore, is generally not an issue. When disputes arise, the overwhelming *958 majority of cases result when the putative father does not receive notice of the adoption proceeding and does not give his consent, either express or implied, to the adoption. There is no perfect world, and there is no ironclad method that will guarantee that there would never be disputes in adoption proceedings. Although this is not a perfect world and there are no guarantees, there is available a procedural device that can provide notice to putative fathers, no matter where that notice is filed, so that if there is an obstacle to the adoption, this obstacle can be discovered and addressed early on, rather than litigating the issue for years and setting up the potential removal of three- and four-year-old children from the only home and parents they have ever known. This procedural device would be a national putative-father registry. It is a procedural device that adoption specialists and adoption attorneys have been calling for for years. Cecily Helms, Phyllis Spence, Take Notice Unwed Fathers: An Unwed Mother's Right to Privacy in Adoption Proceedings, 20 Wisc. Women's L.J. 1 (2005); Donna L. Moore, Implementing a National Putative Father Registry by Utilizing Existing Federal/State Collaborative Databases, 36 J. Marshall L.Rev. 1033 (2003); Mary Beck, Toward a National Putative Father Registry Database, 25 Harv. J.L. & Pub. Pol'y 1031 (2002). Although family issues should normally be reserved to the individual states for resolution, this is one issue that can be solved only by federal legislation, and I hereby humbly request, indeed implore, the United States Congress to enact such legislation to provide putative fathers with notice of the pendency of adoption proceedings.
A putative father is "[t]he alleged biological father of a child born out of wedlock." Black's Law Dictionary 641 (8th ed.2004). A putative-father registry is "[a]n official roster in which an unwed father may claim possible paternity of a child for purposes of receiving notice of a prospective adoption of the child." Black's Law Dictionary 1272. Before 1972, when the United States Supreme Court decided Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), state courts handling adoption proceedings gave very little thought to notifying putative fathers of the adoption proceeding. Adoptions were unknown at common law, and the common law did not provide for the protection of any rights, including custodial rights, of an unwed biological father. An historical perspective is helpful in understanding how we arrived at our present dilemma. Kimberly Barton, writing for the Capital University Law Review, has, as succinctly as possible, set out the historical trail of putative fathers' rights, including a discussion of the four seminal United States Supreme Court cases on the subject: Stanley, supra, Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Ms. Barton summarized as follows:
"To fully understand the rights and interests of unknown biological fathers under current law, it is important to examine both the historical treatment of unwed fathers under statutory and common law, and the Supreme Court cases that have addressed the rights and interests of unwed fathers under the Due Process and Equal Protection Clauses of the United States Constitution.
"A. Historical Treatment of Unwed Fathers

"Prior to 1972, the custodial rights of unwed fathers were not legally protected by common law or statute. The ancient rule at common law governing the custody of illegitimate children came *959 within the doctrine of filius populi, or `son of the people.' This doctrine provided that the custody of an illegitimate child was in the hands of the parish. As such, neither unwed mothers nor unwed fathers had custodial rights under the early common law.
"The common law rule regarding the custody of illegitimate children was eventually modified to award exclusive custody to the mother, thereby excluding only the putative father. This modification `arose from the presumption that [unwed mothers] were better custodian[s] than the putative fathers.' Numerous factors gave rise to this presumption, including `the ease with which the mother could be identified and located, the obligation normally placed by society on the mother to care for and raise her children, and the strength of the bonds of love and affection assumed to exist between mother and child.'
"The common law rule did not contemplate the possibility that unwed `father[s] might seek to assert paternity rather than escape it.' Instead, it presumed that `unwed fathers whose identities were often uncertain, were "irresponsible and unconcerned about their children," and thus not entitled to any relationship with them.'
"Since adoption was unknown at common law, a putative father's rights with respect to the adoption of his child were defined by state statutes. State legislatures provided the general rule that the consent of the unwed mother was enough for legal relinquishment of the child. In fact, states statutorily defined `parent' to include both the mother and father of legitimate children, but only the mother of illegitimate children. States even went so far as to say that a putative father who married the mother of his illegitimate child while adoption proceedings for the child were pending did not acquire the right to consent to the child's adoption. Thus, an unwed father was essentially powerless to prevent his illegitimate child from being placed for adoption if that was the natural mother's wish.
"There were a number of purposes of these early adoption statutes. Lawmakers believed these statutes promoted the adoption of illegitimate children, protected the privacy of unwed mothers, and provided adoptive parents with unassailable rights to their adopted children. It has also been suggested that these early statutes `sought to punish putative fathers for their sins in order to deter promiscuity and illegitimacy, while encouraging marriage and promoting legitimate family units.' In 1972, however, the prevailing view toward unwed fathers was forever changed.
"B. United States Supreme Court Decisions

"In 1972, the United States Supreme Court decided the first of four cases that have had a significant impact on the extent to which a natural father's biological relationship with is illegitimate child receives constitutional protection.
"1. Stanley v. Illinois (1972)

"In this case, Peter and Joan Stanley had lived together for eighteen years in a non-marital relationship, during which time they had three children. When Joan died, the State of Illinois instituted a dependency hearing in conjunction with a state law that declared illegitimate children wards of the State upon the death of the mother. Because the State did not recognize an unwed father as a `parent,' the children were presumed to be without parents and became wards of the State.
"Stanley appealed, claiming that he had never been shown to be an unfit *960 parent. `Since married fathers and unwed mothers could not be deprived of their children without such a showing, [he argued] that he had been deprived' of his Fourteenth Amendment right of equal protection.
"The State contended that its interests in protecting the `"moral, emotional, mental and physical welfare of the minor"' and `"strengthen[ing] the minor's family ties whenever possible"' justified the procedure on the grounds that, as a general rule, unwed fathers were not fit parents. Thus, the State argued that it was not required to give unwed fathers any special treatment with respect to the custody of their children.
"Rejecting the State's contention, the Supreme Court ruled that unwed fathers have a significant private interest in their continued relationship with children they have `sired and raised' that `undeniably warrants deference and, absent a powerful countervailing interest, protection.' Although the Court acknowledged that the State's interests were legitimate, it found that the State's goals of protecting minors and strengthening familial bonds were not furthered by separating children from the custody of fit parents. Therefore, the Court held that the State was barred, as a matter of both due process and equal protection, from taking custody of an unwed father's children, absent a hearing and a particularized finding that the father was an unfit parent.
"2. Quilloin v. Walcott (1978)

"In this case, Randall Walcott, the stepfather of an illegitimate child, sought to adopt his stepson. At the time of the adoption hearing, the child was eleven years old. The child had lived continuously with his stepfather for eight years and expressed a desire to be adopted by him. On the other hand, Leon Quilloin, the child's biological father, had never sought custody of him, had not sought to legitimize him, and `provided [financial] support only on an irregular basis.' Although the child had visited with him numerous times, the mother had concluded that the visits `were having a disruptive effect on the child and [the child's] entire family.'
"Under the relevant state statute, a biological father who had not legitimized his child, either by marrying the mother and acknowledging the child as his own, or by obtaining a court order declaring the child legitimate, was given no veto power over the adoption. His only recourse was to appear at the adoption hearing in an attempt to establish that the adoption was not in the child's best interest.
"After its hearing on the best interests of the child, and without specifically finding that Quilloin was unfit, the trial court granted Walcott's adoption petition, thereby terminating Quilloin's parental rights. Quilloin appealed, arguing that due process required that there be a finding of abandonment or other unfitness before his parental rights could be terminated. He also claimed an equal protection violation because the State did not require a finding of unfitness before terminating the rights of previously-married fathers.
"In its analysis of his due process claim, the Supreme Court noted that Quilloin had been afforded adequate notice and an opportunity to be heard prior to the adoption decree. Therefore, it defined the underlying issue as `whether, in the circumstances of this case and in light of the authority granted by Georgia law to married fathers, [Quilloin's] interests were adequately protected *961 by a "best interests of the child" standard.'
"The Court focused its analysis on the relationship that had been established between Quilloin and his son. It emphasized that this was not a case in which the unwed father at any time had, or sought to have, actual or legal custody of his child, nor was it a case in which the proposed adoption would place the child in the custody of unfamiliar adoptive parents. Rather, the resulting adoption would give full legal recognition to an existing family unit. Therefore, the Court held that the State was not required by due process to find anything more than that the adoption was in the best interests of the child.
"In its analysis of his equal protection claim, the Court found that the interests of fathers like Quilloin differed from those of separated or divorced fathers. Unlike a married father who is separated or divorced from the mother and is no longer living with his child, Quilloin had `never exercised actual or legal custody over his child, and thus, ha[d] or legal custody over his child, and thus, ha[d] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child.' Therefore, the Court held that Quilloin's guarantee of equal protection of the laws had not been violated.
"This case is significant because it was the first time the Court suggested that `a biological connection alone is insufficient to obtain full, constitutionally protected, parental rights.' In subsequent cases, the Court confirmed this principle.
"3. Caban v. Mohammed (1979)

"In this case, Abdiel Caban and Maria Mohammed had lived together in a nonmarital relationship for five years, during which time they had two children. Caban identified himself as the father on both birth certificates, and he contributed to the children's support. After the couple separated, Mohammed took the children and married another man. Caban continued to see the children once a week until their maternal grandmother took them to Puerto Rico. One year later, he went to Puerto Rico to visit the children. The grandmother `willingly surrendered the children to [him]' with the understanding that he would return them in a few days. Caban, however, returned to New York with the children. When Mohammed learned that the children were in his custody, she instituted proceedings in state court and was granted temporary custody. Caban and his new wife were given visitation rights.
"Two months later, Mohammed and her new husband petitioned for adoption of the children. Caban and his wife filed a cross-petition for adoption. Under the relevant state statute, only the mother's consent was necessary for the adoption of an illegitimate child. Pursuant to this law, an unwed mother could block the father's petition by simply withholding consent, but the unwed father could prevent termination of his parental rights only by showing that the best interests of the child would not be furthered by permitting the petitioning couple to adopt the child.
"The lower court granted Mohammed's adoption petition, thereby extinguishing Caban's parental rights and obligations. After the appellate court affirmed, Caban petitioned the United States Supreme Court to review the decision. On appeal, Caban argued that the relevant state statute drew a distinction between unwed fathers and other parents, thus violating his equal protection rights. He also claimed that the *962 Court's decision in Quilloin established that a natural father has a due process right to maintain a parental relationship with his child unless a court concludes that he is an unfit parent.
"Despite these two claims, the Supreme Court defined the pivotal issue as `whether the distinction in [the relevant state statute] between unmarried mothers and unmarried fathers bears a substantial relation to some important state interest.' After acknowledging the State's interests in providing for the well-being of illegitimate children, the Court found that the statutory distinction between unwed fathers and unwed mothers was not substantially related to that interest. The Court concluded that the State's distinction between unwed mothers and unwed fathers `illustrate[s] the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children.'
"The Court appeared to limit its holding to cases involving older children who had a developed relationship with their fathers because in such situations the parental roles of mothers and fathers are not invariably different in importance. However, the Court distinguished this scenario from that of cases in which an unwed father has not come forward to establish a parental interest in his child and stated that `nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child.'
"Four years later, the Court addressed a more difficult case concerning an unwed father who had not been given the opportunity to form a relationship with his young child.
"4. Lehr v. Robertson (1983)

"In this case, Jonathan Lehr lived with Lorraine Robertson in a non-marital relationship, during which they had a daughter. Eight months after the young girl's birth, Robertson married another man, and the couple filed an adoption petition in state court two years later. Because Lehr did not fall into any of the categories of putative fathers who were required by the State to receive notice of adoption proceedings, he was not notified of the petition. Approximately one month later, still unaware of the Robertsons' adoption petition, Lehr filed a petition in a different county court, asking for `a determination of paternity, an order of support, and reasonable visitation privileges.'
"Lehr first learned of the adoption proceeding when he received notice of a change of venue motion that had been filed by the Robertsons in his paternity action. He planned to seek a stay of the adoption proceeding pending the determination of the paternity petition, but when his attorney called the judge to inform him of Lehr's intention, the judge advised the attorney that the adoption order had been signed earlier that day.
"Lehr filed a petition to vacate the order of adoption, claiming it had been `obtained by fraud and in violation of his constitutional rights.' The trial court denied his petition and held that the `commencement of a paternity action did not give him any right to receive notice of the adoption proceeding.' Both the appellate court and the State's highest court affirmed, parenthetically noting that Lehr could have insured his right to notice by registering with the State's putative father registry.
"Lehr appealed the decision to the U.S. Supreme Court, claiming that due process required that an unwed father *963 receive notice and an opportunity to be heard before his actual or potential relationship with his child born out of wedlock could be terminated. He also argued that the statute's gender-based classification violated his equal protection rights because it denied him the right to consent to his daughter's adoption and afforded him fewer procedural rights than her mother.
"The Court began its analysis by focusing on the nature of the private interest involved. After identifying the individual interest as being that of the parent-child relationship, the Court discussed the two types of relationships that exist between putative fathers and their children. The first type is the solely biological relationship present in Quilloin, which the Court characterized as inchoate because it consists merely of the potential to develop into a full relationship. The second type, by contrast, is the developed relationship present in Stanley and Caban which results `[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child."' In this type of relationship, the putative father's `interest in personal contact with his child receives substantial protection under the Due Process clause.' The Court justified this distinction, stating:
"`The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.'
"Because it adequately protected those classes of fathers who had a substantial relationship with their children, the Court held that the state statute did not violate due process.
"Like the lower courts, the Supreme Court emphasized that the right to receive notice of the adoption petition was in Lehr's control because of the State's enactment of a putative father registry. The Court did not consider as arbitrary the State Legislature's concerns that `a more open-ended notice requirement would merely complicate the adoption process, threaten the privacy interests of unwed mothers, create the risk of unnecessary controversy, and impair the desire of finality of adoption decrees.' Because of these concerns, the Court noted the State Legislature created a putative father registry to allow an unwed father to guarantee that, by mailing a postcard to the appropriate state agency, he would be entitled to receive notice of any adoption proceedings involving his child. The Court also ruled that a putative father's failure to register due to his ignorance of the law did not constitute a sufficient reason for criticizing the law. Ultimately, it concluded that `[t]he Constitution does not require either a trial judge or litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights.'
"In its analysis of Lehr's equal protection claim, the Court considered the State's differential treatment of unwed mothers and unwed fathers. After finding that unwed fathers who had not established a relationship with their children were not similarly situated with mothers who had, it concluded that the *964 `Equal Protection Clause [did] not prevent [the] State from according the two parents different legal rights.'
"Taken together, these four unwed father cases suggest that while a biological relationship between a father and his child will not give rise to the father's constitutional rights, the father may establish a constitutionally protected liberty interest by developing and maintaining a substantial relationship with his child. Unfortunately, these cases have left many important questions unanswered.
"C. Unanswered Questions

"Although the Supreme Court has offered a great deal of guidance in cases involving unwed fathers and older children, it has not decided any cases involving the adoption of newborns conceived out of wedlock. The Court refused to stay the state court proceedings in the case of Baby Jessica and refused to grant certiorari in the case of Baby Richard, thus suggesting that it is currently `unwilling to address the question of whether an unwed father has a legal interest in  and thus the right to veto the adoption of  a child he sired out of wedlock and with whom he has not yet had an opportunity to develop a relationship.'
"The matter of newborn adoption becomes even more complicated when the father is not only unwed, but unknown. Since the Court has not decided whether an attempt must be made to give notice of an adoption petition to an unwed father whose identity or whereabouts are unknown, states have had little guidance in developing statutory procedures to address this complex issue."
Who's Your Daddy? 32 Cap. U.L.Rev. at 115-27 (emphasis added; footnotes omitted).
Most states have now passed some form of a putative-father registry or registration of paternity, and in doing so these states, including both Alabama and Nebraska, have done all they can to protect the rights of putative fathers and the privacy interests of unwed birth mothers, prospective adoptive couples, and potential adoptees, in proceedings within the borders of each of those states.[8] In an increasingly mobile society, however, such state registries cannot, and do not pretend to, provide protection for the varied interstate interests that may arise in the possible scenario where a putative father may reside in one state, a birth mother in another state, conception occurred in a third state, the birth of the child took place in a fourth state, and the child was placed for adoption in potentially a fifth state. Should the birth mother change her residence after birth but before the child's placement, a potential sixth state could be involved, as well as any lesser number of states, depending upon the particular facts. This makes it virtually impossible for a responsible putative *965 father who wants to avail himself of a proper registration to protect his potential rights to the child to be able to ascertain the proper forum state in which to do so. In fact, a putative father under such a hypothetical might well never know the identity of any of the states involved other than the state of his own residence.
The concept of a putative-father registry may be burdensome to a putative father, but it cannot be contradicted that it gives him an opportunity to, and a procedure by which he can, perfect and propound that right, which he did not have before such registries.[9] A putative-father registry also protects the privacy rights of the unwed *966 birth mother by not forcing her to disclose the identity of the birth father against her wishes. The concept of a putative-father registry further protects the rights of the adoptive couple by giving them the confidence and assurance that the rights to notice and the issue of consents, whether express or implied, of all necessary parties has been judicially considered in the adoption forum and that there will never be a heartbreaking Baby Jessica or Baby Richard ending to their adoption. A putative-father registry advances the state's interest in promoting "the welfare or best interests of the [adoptee], which include the encouragement of adoption in general and an expeditious and positive adoption specifically." 2 C.J.S. Adoption of Persons § 4 (footnotes omitted). Finally, and certainly most importantly, a putative-father registry helps protect the best interests of the adoptee, especially an infant child, so that this child will either know and receive the love and benefit of his or her biological father, or the love and benefit of adoptive parents, but not have to undergo the emotionally wrenching experience of coming to know both through a change in custody occasioned by protracted litigation that only belatedly considered and protected the rights of the biological father.
There can never be a perfect procedure for giving notice to putative fathers in newborn adoptions. It is a biological and common-sense fact that the identity of the mother will always be known, but not so the biological father. Given the competing interests of the parties involved, there is only so much that government can do to search out putative fathers and give them notice of an adoption proceeding while protecting the privacy interests of the biological mother, who cannot be forced to disclose the identity of the putative father, and at the same time providing for an expeditious adoption proceeding. Various commentators have brought forth criticisms of putative-father registries on different grounds. Some believe that the establishment of putative-father registries as the sole vehicle for putative fathers to propound their rights does not go far enough, and that a mother should be encouraged to disclose the father's identity so that more effective means of notice can be used. Analogies have been made that governmental programs exist that require mothers receiving public aid to cooperate in good faith in establishing paternity of their children. Jeffrey Parness, Adoption Notices to Genetic Fathers: No to Scarlet Letters, Yes to Good-Faith Cooperation, 36 Cumb. L.Rev. 63, 76-81 (2006). While this may be an effective economic incentive for birth mothers in need of financial aid, there would be no such economic motivation for the birth mother who is placing the child for adoption. Others note that it may be faulty to assume that "putative fathers know the registry exists and understand the requirements of proper registration," Robbin Pott Gonzalez, The Rights of Putative Fathers to Their Infant Children in Contested Adoptions: Strengthening State Laws that Currently Deny Adequate Protection, 13 Mich. J. of Gender & Law 39, 49 (2006), and that "[f]ew states include publicity requirements in the registration statute." Laurence C. Nolan, Preventing Fatherlessness Through Adoption While Protecting the Parental Rights of Unwed Fathers: How Effective Are Paternity Registries?, 4 Whittier J. Child & Family Advoc. 289, 321 (2005). These may be valid criticisms, but there must be a balancing of all competing interests when *967 considering the overriding concern  the best interests of the adoptee. Certainly, states can be encouraged to publicize these putative-father registries and to advise potential fathers of their rights under such registries. It must be remembered that the predicament being addressed was created when a potential father engaged in an extramarital sexual relationship that he knew could possibly lead to the conception of a child. The irresponsible putative father who has no interest in any child so conceived does not have to register and thus frees the child for adoption into a loving home. Should he belatedly decide that he wants to establish a relationship with the child, neither the child nor the adoptive parents have to worry about a subsequent traumatic interruption of their family unit. However, the responsible putative father who wants to establish and have the privilege of enjoying a father/child relationship has the ability to do so simply by perfecting his registration  a small price to pay for the preservation of his right to a parental relationship. Again, by putting the child's best interests uppermost in the adoption process, a putative-father registry allows obstacles to the adoption to be quickly discovered so that if the adoption cannot be finalized, the litigation surrounding it will not drag on for years. A national putative-father registry would further protect against extended litigation caused by multijurisdictional disputes as is the case here.
A national putative-father registry would not be difficult either to conceive or to implement. It could be as simple as an amalgamation of the registries in all states, which would make putative-father registration accomplished anywhere available to any trial judge handling an adoption at the beginning of the proceeding, so that, as stated above, these issues can be discovered and litigated quickly. The potential implementation of such a registry has been well stated to be as uncomplicated as the following:
"Congress should enact a national putative father registry database to address the interstate effect of adoptions. The system would have the dual purposes of facilitating notice of adoption proceedings to unmarried birth fathers in interstate adoptive situations and of promoting secure adoptive placements. The state putative father registries should file with the national putative father registry database for every man who files with the State. Each State should maintain its own statutory adoption scheme including regulation of the parental rights and responsibilities of unwed fathers. The national link should provide a means for the registered unwed father to obtain notice of the need to protect his parental rights in any of the participating states despite the interstate travel of the mother. . . .
". . . State laws should require attorneys, state agencies, and/or adoption agencies in a planned or pending adoption to search the nationally linked putative father registry before final disposition of the adoption proceedings."
Beck, 25 Harv. J.L. & Pub. Pol'y at 1038 (footnotes omitted).
With regard to the constitutional authority of Congress to enact federal legislation providing for a national putative-father registry and the ability of Congress to encourage state participation in a national registry, the above article goes on to state:
"Congress is the appropriate legislative body for putative father registry legislation because adoption has a federal aspect, in that a woman may conceive a child in one State, reside in a second State, give birth in a third State, and relinquish for adoption in a fourth State. It is in this situation, where the biological *968 mother, biological father, the adoptive parent(s), and the child have connections to two or more States, that the individual state putative father registries can neither protect the rights of putative fathers nor advance the interests of children. Only federal legislation providing a national database, linking all participating state registries, can effectively address this family-law problem, even though family law, including adoption, is traditionally reserved to the States. This precise rationale underlies other federal statutes, including most notably the Child Support Recovery Act.
"Congress may enact a federal putative father registry database under the commerce power. Adoption is not traditionally considered commerce because nothing is bought or sold. Interstate adoption substantially affects interstate commerce, however, because of the aggregate transaction costs involved. Adoptive parents may incur large legal debts, ranging between zero and $30,000, across at least two States. Part of that debt derives from the interstate nature of the adoption, which necessarily involves interstate travel. These burdens, plus an increased likelihood of litigation resulting from incompatible and unconnected state registries, increase the expense incurred in interstate commerce. A federal registry statute, therefore, will regulate an area `substantially affect[ing] interstate commerce.' The commerce power, then, will allow Congress to erect and operate a national putative father registry database.
"A secure authority for securing state participation, and providing funding to States, is the spending power. The Supreme Court has adopted the view that Congress has broad authority to tax and spend for the general welfare. A nationally linked putative father database would both advance children's rights to stable and permanent homes and protect the liberty interest unmarried fathers have in developing relationships with their children. These two benefits demonstrate that a national registry database would serve the general welfare of the nation.
"The Supreme Court has explained that Congress may permissibly set conditions for the receipt of federal funds even as to areas that Congress might otherwise not be able to regulate. Such an arrangement is particularly applicable to a congressional grant of funds to the States for family law purposes, i.e., the erection of state registries compatible with a national database. Specifically, the Court wrote, `[w]hile the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to States shall be disbursed.' The Court continued this reasoning in South Dakota v. Dole, [483 U.S. 203 (1987),] where Congress sought to create a minimum drinking age by withholding a portion of federal highway funds from States that failed to impose such a minimum drinking age. The Court permitted this conditioning of federal funds, because it served the general welfare by providing for safer interstate travel and it could be characterized as a permissible economic inducement as opposed to coercion. Congress may therefore provide money to States to erect state-level putative father registries and condition this and other federal monies on compliance with national putative father registry guidelines.
"In summary, the rationale for such federal intervention into family law, which is traditionally reserved to the States, are the facts that individual States cannot effectively address the *969 problems typically associated with contested interstate adoptions and that only a federally established nationally linked putative father database can solve the problems. A national database may be erected by Congress under the commerce power, and state funding and cooperation may be secured through the spending power."
Beck, 25 Harv. J.L. & Pub. Pol'y at 1073-75.
As in the cases of Baby Richard and Baby Jessica, and similar adoption proceedings that have gone awry and that have lasted far too long, there can be no happy ending for everyone concerned here. Depending upon the ultimate result reached in this matter by the appropriate forum, either a father will have lost his rights to his biological child, or the lives of D.B. and T.B., the adoptive parents, will be forever devastated. And what of the child? He will either have lost his opportunity to know and love his biological father, or he will be pulled away screaming and crying, both physically and emotionally, nearly four years of age, from the arms of an adoptive mother and an adoptive father who have loved, held, and protected him almost since birth. Children such as Baby Richard, Baby Jessica, and now possibly this child do not make the laws that put them at risk; rather, shame on the adult lawmakers who have failed to enact legislation that would prevent another tragic adoption result. I call upon Congress to stop this madness  stop this madness before another father, another child, and another adoptive family endure this inconceivable and inconsolable heartache.
STUART and SMITH, JJ., concur.
NOTES
[1] Although not named as a party to the appeal in the Court of Civil Appeals or to the proceedings in this Court, DHR filed a brief in both the Court of Civil Appeals and in this Court; the cover of each of those briefs is green. See Rule 28(h), Ala. R.App. P. ("the cover of the brief of . . . an intervenor or amicus curiae [must be] green").
[2] Our decision is consistent with one of the purposes of the PKPA as stated by Congress in § 7(c) of the Parental Kidnaping and Prevention Act of 1980, Pub.L. No. 96-611, 94 Stat. 3566:

"(c) The general purposes of [the PKPA] are to ,
". . . .
"(6) deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards."
(Emphasis added.)
As one commentator has noted:
"The third purpose of the [PKPA] was to reduce the temptation the UCCJA [Uniform Child Custody Jurisdiction Act] created for litigants to race to the courthouses of different states when filing petitions for initial custody or visitation awards. Section 6(a) of the [UCCJA] barred the exercise of jurisdiction in the second of two cases that were both commenced consistently with UCCJA standards, even if the first case was based only on section 3(a)(2) `significant connections' and `substantial evidence' jurisdiction, while the second case was based on `home state' jurisdiction. This provision created an incentive for both parties to begin litigation in their respective states as early as possible.
"Section 1738A reduced the number of cases with such an incentive, by providing that the federal bar on exercising jurisdiction protected a prior, pending case based on section 3(a)(2) jurisdiction only if the child had no `home state' when that case was commenced. Thanks to this federal provision, a race to courthouses for an initial proceeding was invited only when no home state existed."
Russell M. Coombs, Child Custody and Visitation by Non-Parents Under the New Uniform Child Custody Jurisdiction and Enforcement Act: A Rerun of Seize-and-Run, 16 J. Am. Acad. Matrim. Law. 1, 57 (1999) (emphasis added).
[3] In addition, construing § 43-1233, Neb. Rev.Stat., as requiring service of process is consistent with the decision cited by the Court of Civil Appeals, Nelson v. Robinson, 154 Neb. 64, 70, 46 N.W.2d 892, 895 (1951), for the proposition that "Nebraska has mandatory explicit statutory provisions providing for service of process and when service [does] not meet those requirements [a] trial court [does] not obtain jurisdiction over the defendant," 975 So.2d at 939, as well as with the decision cited by the adoptive couple, Thornton v. Thornton, 13 Neb.App. 912, 929, 704 N.W.2d 243, 256 (2005) (quoting Anderson v. Autocrat Corp., 194 Neb. 278, 231 N.W.2d 560 (1975)), for the proposition that "[s]tatutes prescribing the manner of service of summons are mandatory and must be strictly complied with."
[4] In the event the Nebraska notice requirements conflicted with those of the PKPA, the PKPA, as federal law, would control. See Blankenship v. Blankenship, 534 So.2d 320, 321 (Ala.Civ.App.1988) ("In our application of these two statutes, we have held that in areas of conflict between the two on matters of jurisdiction the federal provision  the P.K.P.A.  preempts Alabama's version of the U.C.C.J.A."). See also U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").
[5] The final contention of the father is that his "liberty interest," protected by the Due Process Clause of U.S. Const. amend. XIV, requires Alabama to enforce the Nebraska judgment. That claim, however, is resolved by our conclusion that, because the notice requirement of the PKPA was not met, Alabama does not have to enforce the Nebraska judgment.
[6] Interest of B.G.C., 496 N.W.2d 239 (Iowa 1992); In re Baby Girl Clausen, 442 Mich. 648, 502 N.W.2d 649 (1993).
[7] In re Petition of Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995).
[8] Ala.Code 1975, § 26-10C-1; Ariz.Rev.Stat. § 8-106.01; Ark.Code Ann. § 20-18-701 et seq.; Colo.Rev.Stat. § 19-4-105; Conn. Gen. Stat. §§ 45a-716 and 46b-172a; 13 Del.Code § 8-401 et seq.; Fla. Stat. § 63.054; Ga.Code Ann. § 19-11-9; Haw.Rev.Stat. § 578-2(d)(5); Idaho Code § 16-1513; 750 Ill. Comp. Stat. 50/12.1; Ind.Code § 31-19-5-2 et seq.; Iowa Code § 144.12A; La.Rev.Stat. 9:400; Mass. Gen. Laws ch. 210, § 4A; Mich. Comp. Laws § 710.33; Minn.Stat. § 259.52; Mo.Rev.Stat. § 192.016; Mont.Code Ann. § 42-2-201 et seq.; Neb.Rev.Stat. § 43-104.01 (2007 Neb. Laws L.B. 296); N.H.Rev. Stat. Ann. § 170-B:5; N.M. Stat. Ann. § 32A-5-20; N.Y. Soc. Servs. Law § 372-c; Ohio Rev.Code Ann. § 3107.061 et seq.; Okla. Stat. tit. 10, § 7506-1.1; Or.Rev.Stat. § 109.096(3); 23 Pa. Cons.Stat. § 5103; Tenn.Code Ann. § 36-2-318; Tex. Fam.Code Ann. (Vernon) § 160.401; Utah Code Ann. § 78-30-4.13 (2007 Utah Laws Ch. 196 HB.51); Va.Code Ann. § 63.2-1249 et seq. (eff. July 1, 2007); Vt. Stat. Ann. tit. 15, § 307; Wis. Stat. § 48.025; and Wyo. Stat. Ann. § 1-22-117.
[9] In M.V.S. v. V.M.D., 776 So.2d 142, 149-51 (Ala.Civ.App. 1999), the Court of Civil Appeals stated:

"The legislature apparently concluded that a man concerned that he has impregnated a woman, and who is interested in taking responsibility for his offspring, should take affirmative action by filing with the registry. The effort required for filing with the registry is minimal. In fact, the legislature mandated that the Department of Human Resources create a form to ease the filing requirements. See § 26-10C-1(g). The Supreme Court noted in Lehr that the unwed father's right to notice of adoption proceedings was within his control because `by mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [the child].' 463 U.S. at 264, 103 S.Ct 2985. The Supreme Court in Lehr ruled that due process for unwed fathers requires that state law provide an adequate opportunity for them to claim paternity and to take responsibility for their children in a timely manner. Lehr recognized that limits on procedural protection for a putative father are necessary from the prospective of the child, who needs a stable start in life and needs stability early.
". . . .
"There are compelling reasons for the legislature's providing a specified period within which to assert parental rights as an unwed father. If adoption were precluded until a putative father acted to assert his rights, then protracted litigation would undoubtedly ensue. Take the widely publicized cases of In re Baby Girl Clausen, 442 Mich. 648, 502 N.W.2d 649 (1993), and In re Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995), cert. denied, 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 846 (1995), better known as the `Baby Jessica' and `Baby Richard' cases. In both cases, the biological mothers placed children for adoption. After finding out about the adoptions, both biological fathers claimed that they had not properly given their consent to the adoptions. Both cases were litigated for years and were eventually resolved in favor of the biological fathers. The children (ages two and four) were taken from the only homes they had ever known in order to protect the rights of their biological fathers. A law such as the Putative Father Registry Act would have prevented such an adoption fiasco.
"An unwed father, by merely registering under the Act, obtains a right to notice and an opportunity to be heard. In discussing Illinois's Putative Father Registry Act, which was adopted in response to the Baby Richard case, one writer has noted, with regard to the burden placed on the unwed father:
"`The burden placed on putative fathers under Illinois's new legislation is not necessarily out of step with modern mores or the realities of contemporary heterosexual relationships. Neither is it completely unrealistic. To meet the burden which the new legislation places on a putative father, he need neither remain in contact with a woman with whom he has had sexual intercourse, nor turn to other sources of information to determine whether he has conceived a child with her. Under the new legislation, a putative father need only file with the putative father registry based on his knowledge that he has had intercourse with a woman and commence a parentage action within thirty days of that filing. His interests will not be jeopardized if he ends relations with her, and his social habits are not, therefore, greatly affected. By simply mailing a postcard to the registry and commencing a parentage action, tasks which can hardly be labeled a burden, a putative father can preserve his rights to notice and consent.'
"Mahrukh S. Hussaini, Incorporating Thwarted Putative Fathers into the Adoption Scheme: Illinois Proposes a Solution After the `Baby Richard' Case, 1996 U. Ill. L.Rev. 189, 220 (1996)."